**Elnora CAMP, as Administrator of the Estate of Anthony Young, Deceased, Plaintiff–Appellant,**

v.

**George GREGORY, Defendant–Appellee.**

No. 93–3314.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 8, 1994.

Decided Oct. 2, 1995.

Rehearing Denied Oct. 23, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 4, 1995.

Thomas M. Cushing (argued), Ambrose & Cushing, Chicago, IL, for Plaintiff–Appellant.

Rita M. Novak, Alison E. O'Hara (argued), Office of the Attorney General, Civil Appeals Division, Chicago, IL, for Defendant–Appellee.

Before COFFEY and ROVNER, Circuit Judges, and FOREMAN, District Judge.*

ILANA DIAMOND ROVNER, Circuit Judge.

Anthony Young died on his sixteenth birthday. At the time of his death, Anthony was under the guardianship of the Illinois Department of Children and Family Services ("DCFS"). His aunt and former guardian, Elnora Camp, brought this suit contending that George Gregory, the DCFS caseworker assigned to Anthony, had denied Anthony substantive due process by failing to ensure that Anthony was placed in a safe living

---

* The Honorable James L. Foreman, of the South- ern District of Illinois, sitting by designation.

environment. The district court dismissed the suit, believing that the Supreme Court's decision in *DeShaney v. Winnebago County Dep't of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), shielded Gregory from liability for his decision where to place Anthony. Because the DCFS had assumed guardianship over Anthony, we do not think *DeShaney* necessarily bars Camp's due process claim. However, we do conclude that Gregory is entitled to qualified immunity, as prior caselaw did not make clear that a state official could be liable under facts analogous to those alleged here.

## I. FACTS

Our recitation of the facts derives from the allegations of Camp's amended complaint.[1] For present purposes, we accept these allegations as true, extending to Camp the benefit of every reasonable inference that may be drawn from the amended complaint. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, ——, 113 S.Ct. 1160, 1161, 122 L.Ed.2d 517 (1993); *MCM Partners, Inc. v. Andrews–Bartlett & Assocs., Inc.,* 62 F.3d 967, 971 (7th Cir.1995). We may affirm the dismissal of that complaint only if "it appears 'beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief.'" *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972) (per curiam) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)); *see also Graehling v. Village of Lombard, Ill.,* 58 F.3d 295, 297 (7th Cir.1995).

The DCFS became Anthony's guardian on June 25, 1991, by order of the Circuit Court of Cook County, Illinois. Prior to that time, Camp had assumed guardianship of Anthony from his mother, whose medical condition rendered her unable to care for him. Camp ultimately sought appointment of another guardian, however, after concluding that she could not provide the highly structured and closely supervised environment necessary to assure Anthony's safety and well-being.[2] The state court granted her request and by agreement appointed the DCFS Anthony's guardian. Gregory was subsequently assigned to be Anthony's caseworker.

A DCFS referral form completed by a probation officer assigned to the Cook County Juvenile Court recommended that Anthony be placed in a highly structured environment. Despite knowing that Camp could not provide the degree of supervision and care that Anthony required and that Anthony faced a greater than normal risk of physical harm while living in her home, Gregory returned him to Camp's care. Subsequently, he neglected to make any referral or application for any appropriate educational or guidance program and failed to follow up on Anthony's progress. Yet, on September 20, 1991, he represented under oath to the state court (which had retained jurisdiction over Anthony's case to monitor his progress) that Anthony had been returned to Camp at the request of the Camp family, that Anthony was attending school, and that he was "doing fine." Amended Complaint ¶ 13. Each of these representations was false and Gregory knew as much.

Ten days later, on September 30, 1991, Camp wrote to Gregory noting that her previous telephone calls to him had gone unanswered. She requested information concerning appropriate referrals and advised Gregory that Anthony was not attending school and was "placing himself in situations jeopardizing his physical safety as well as his education." Amended Complaint ¶ 14. She also reiterated that she could not ensure Anthony's safety.

Anthony remained in Camp's care until he died on December 30, 1991. Camp contends that his death resulted directly from Gregory's failure to arrange for Anthony to be placed in an appropriate environment and to be given the types of services he required in order to ensure his safety and well-being.

---

1. Mr. Gregory contends that the district court erred in allowing Ms. Camp to file her amended complaint after the court had already entered a judgment of dismissal based on the original complaint. We take that question up below.

2. The amended complaint does not reveal the reason for the degree of structure and supervision that Anthony allegedly required.

## II. AMENDMENT OF THE COMPLAINT

Before we address the viability of Camp's claims, we must first consider whether the district court abused its discretion in permitting her to file an amended complaint. The district court granted Gregory's motion to dismiss the original complaint in an opinion dated August 10, 1993, 1993 WL 311935. That opinion was entered on the docket on the following day along with a civil judgment form stating that "defendant's motion to dismiss is granted." R. 22. On September 10, 1993, the parties appeared before the court on the plaintiff's motion for leave to file an amended complaint. Gregory's counsel objected to the request, contending that final judgment had been entered terminating the case and that the court consequently lacked jurisdiction to entertain the motion. The district court opted to construe Camp's papers as both a motion for relief from the judgment under Fed.R.Civ.P. 60(b), which it granted, as well as a motion for leave to file an amended complaint, which it also granted. However, convinced that the amended complaint still did not present a viable claim, the court entertained Gregory's oral request to dismiss the new complaint and granted that request as well.

■ Here, Gregory renews his contention that the district court was without jurisdiction to entertain Camp's motion for leave to file an amended complaint and that we should therefore confine our attention to the original complaint. One might think this argument was rendered moot by the district court's decision to dismiss the amended complaint for the same reasons it disposed of the first. There are significant differences between the two complaints, however. In particular, the original complaint alluded to Anthony's "history of ongoing street-gang involvement" (Complaint ¶ 10(c)), and in its opinion granting the motion to dismiss that complaint, the district court "read[ ] between the lines" and assumed that Anthony was a gang member and that his death was gang related. 1993 WL 311935, at *1. The court went on to hold that "a claim under 42 U.S.C. § 1983 cannot be founded on a gang-related killing, at least not in the circumstances al-

leged." *Id.* at *1. (We do not know, on the present record, whether Anthony's death was in fact gang related.) To the extent the viability of the complaint turns on whether Anthony's death occurred outside of the Camp household at the hands of third parties, omission of the reference to gang involvement arguably strengthens the complaint.

■ Federal Rule of Civil Procedure 15(a) dictates that leave to amend a pleading "shall be given whenever justice so requires," *see Sanders v. Venture Stores, Inc.,* 56 F.3d 771, 773 (7th Cir.1995); and, indeed, the rule expressly grants a plaintiff one opportunity to amend her complaint as a matter of course before a responsive pleading is served. A motion to dismiss does not constitute a responsive pleading for purposes of Rule 15(a); thus, an order dismissing the original complaint normally does not eliminate the plaintiff's right to amend once as a matter of right. *See Bieneman v. City of Chicago,* 838 F.2d 962, 963 (7th Cir.1988) (per curiam); *Willhelm v. Eastern Airlines, Inc.,* 927 F.2d 971, 972 (7th Cir.1991). If final judgment is entered dismissing the case, however, the plaintiff loses that right. *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1111 (7th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985); *see also Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 784 (7th Cir.1994). At that juncture, the plaintiff must either appeal the dismissal or seek to have the case reopened so that she may pursue amendment of the complaint. *Car Carriers,* 745 F.2d at 1111; *see also Rothner v. City of Chicago,* 929 F.2d 297, 300 (7th Cir.1991). Camp opted to follow the latter course here, although she did so under the guise of a Rule 15(a) motion alone, without first seeking relief from the judgment pursuant to Fed.R.Civ.P. 59(e) or 60(b).

■ Under the circumstances presented, we do not find Camp's failure to file a Rule 59 or 60 motion fatal to the amended complaint. As Gregory points out, we have held that once final judgment has been entered, the district court lacks jurisdiction to entertain a motion for leave to amend the complaint unless the plaintiff also moves for

relief from the judgment. *Paganis v. Blonstein*, 3 F.3d 1067, 1073 (7th Cir.1993); *see also Garner v. Kinnear Mfg. Co.*, 37 F.3d 263, 270 (7th Cir.1994); *Harris v. City of Auburn*, 27 F.3d 1284, 1286–87 (7th Cir. 1994); *Vicom*, 20 F.3d at 784 & n. 12 (7th Cir.1994). Our cases also suggest that when the plaintiff files a motion for leave to amend alone, the court is not *obligated* to construe it as a simultaneous request for relief under Rules 59 or 60. *See Vicom*, 20 F.3d at 784–85 & n. 13. But we have never held that a district court *may not* do so. On the contrary, absent a showing of prejudice to the defendants, we believe that the district court retains the discretion to treat a Rule 15(a) motion as one also made under Rules 59 or 60. *See Car Carriers*, 745 F.2d at 1112 (district court correct to characterize plaintiff's "Motion for Leave to File an Amended Complaint" as a motion for relief under Rule 59(e) or 60(b)); *Paganis*, 3 F.3d at 1074 (Cudahy, J., concurring) (suggesting that "a requirement of two separate pieces of paper may serve only a formalistic end"). Gregory has identified no prejudice to himself in the district court's decision to so construe Camp's motion, nor has he otherwise demonstrated that the court's liberal interpretation of the motion constituted an abuse of discretion.

■ Gregory goes on to argue that the district court erred in granting relief under Rule 60(b). It is true that relief under Rule 60(b) is an extraordinary remedy reserved for the exceptional case (*e.g., Dickerson v. Bd. of Educ. of Ford Heights, Ill.*, 32 F.3d 1114, 1116 (7th Cir.1994)), and the mere desire to expand the allegations of a dismissed complaint does not, by itself, normally merit lifting the judgment. *See Car Carriers*, 745 F.2d at 1112; *Garner*, 37 F.3d at 270. Nonetheless, whether to grant a Rule 60(b) motion is a question committed to the district court's discretion, and our review is correspondingly limited. *E.g., Mares v. Busby*, 34 F.3d 533, 535 (7th Cir.1994). We detect no abuse of the court's discretion here. In granting the defendant's motion to dismiss the original complaint, the district court had "read[ ] between the lines" of a complaint that "state[d] very few facts." 1993 WL 311935, at *1. Lack of factual clarity is normally a flaw that

can be corrected through amendment of the complaint, and in seeking leave to amend, Camp's counsel reminded the district court that while the motion to dismiss was under advisement, he had sought and received assurance from the court that he be given an opportunity to replead in the event the original complaint were dismissed. R. 30 at 2, 4–5. The court itself pointed out that the amended complaint "does certainly state with greater particularity where [Camp] [is] coming from...." R. 30 at 5. In that sense, the amendment aided the district court's evaluation of the claim, as it has our own. Thus, although the court remained convinced that Camp still did not have a viable cause of action, we do not think it was an abuse of discretion to grant Camp permission to file the amended complaint.

We are not confident in any event that the district court had, in fact, entered final judgment in advance of Camp's request to amend the complaint. In moving for dismissal, Gregory had not specified whether he sought dismissal of the complaint or dismissal of the case. Likewise, in granting the motion, the district court merely noted in its opinion and accompanying minute order that "defendant's motion to dismiss is granted." True, the deputy clerk's preparation and entry of an AO 450 judgment form would tend to suggest that the court meant to enter final judgment. Yet, we have deemed a Rule 58 judgment reflecting the dismissal of the complaint rather than dismissal of the case *not* to constitute a final order terminating the litigation for purposes of appeal. *Benjamin v. United States*, 833 F.2d 669, 671–72 (7th Cir.1987); *cf. Paganis*, 3 F.3d at 1070 (judgment form not ambiguous as to finality where, inter alia, "the judgment did not simply grant a motion"). Here, the judgment form merely repeated that the motion to dismiss was granted, without specifying whether the complaint alone was dismissed—leaving intact Camp's right to amend the complaint once as a matter of course, *Bieneman*, 838 F.2d at 963—or that the case was dismissed—requiring her either to appeal or seek relief from the judgment and then leave to amend. In construing Camp's Rule 15(a) motion generously, the district court itself appeared to recognize

that the judgment form was potentially ambiguous. R. 30 at 6–7. Under these circumstances, we think the district court acted well within its discretion in granting leave to amend.

### III. SUBSTANTIVE DUE PROCESS CLAIM

Relying on the Supreme Court's decision in *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), Gregory argues that "Anthony had no constitutional right to have his DCFS caseworker protect him from being killed in a gang-related incident in his neighborhood." Gregory Br. at 13. This argument arguably narrows the complaint prematurely. As we have noted, the amended complaint omits any reference to Anthony's gang involvement; but even the original complaint merely noted that Anthony had a history of gang involvement—it did not allege that Anthony's death was tied to this activity. Thus, the precise circumstances of Anthony's death are not at all clear at this juncture. Yet, it does seem reasonable, in light of what has been alleged, to assume that Anthony's death occurred outside of his home at the hands of someone other than a family member. The essence of Camp's claim, after all, is not that she or someone else in the Camp household posed a danger to Anthony, but that she was unable to protect him from dangers posed by others. And, indeed, Camp's counsel represented to us at oral argument that Anthony was shot and killed two blocks from Camp's home. Having this in mind, we take up two questions: first, whether, by virtue of it being appointed Anthony's guardian, the DCFS (and thus Gregory) acquired any duty to protect Anthony that it otherwise would not have under *DeShaney*; and second, whether that duty extends to dangers beyond the household in which the DCFS and Gregory placed Anthony. We understand Gregory to answer "no" to both inquiries. Our analysis begins with review of *DeShaney*.

#### A. *DeShaney*

In *DeShaney*, the Court held that due process did not require the state to protect a child from the abuse he suffered at the hands of his father. Joshua DeShaney had repeatedly been taken to the local emergency room with injuries that physicians suspected were due to physical abuse. At one point Joshua was temporarily placed in the custody of the hospital while a "Child Protection Team" evaluated his situation; however, the Team determined there was insufficient evidence that he was being abused to retain custody. Joshua was returned to his father's custody and, despite subsequent hospital admissions for injuries indicative of abuse, local officials failed to intervene. Ultimately, his father beat Joshua so severely that he was expected to spend the remainder of his life in an institution for the profoundly retarded.

Despite the fact that local officials had suspected ongoing abuse, the Court rejected the contention that they had deprived Joshua of his liberty in violation of due process by taking no action:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text.... Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes.

489 U.S. at 195–96, 109 S.Ct. at 1003.

The Court acknowledged that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." 489 U.S. at 198, 109 S.Ct. at 1004. Thus, when someone is incarcerated, the Eighth Amendment (via the Fourteenth)

requires the State to provide him with adequate medical care. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Similarly, substantive due process compels the State to take reasonable steps to ensure the safety of individuals involuntarily committed to its mental facilities. *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

But these cases afford petitioners no help. Taken together, they stand only for the proposition that when the State takes a person into its custody and hold him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. In the substantive due process analysis, it is the State's affirmative act of restraining the individuals's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

The *Estelle–Youngberg* analysis simply has no applicability in the present case. Petitioners concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor. While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individuals's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua.

489 U.S. at 199–201, 109 S.Ct. at 1005–06 (footnotes and citations omitted).

## B. Gregory's Duty to Protect Anthony Generally

■ In essence, Gregory argues that this case is on all fours with *DeShaney,* and that he bore no duty to protect Anthony from a danger that neither he nor the State played any role in creating. Likewise, although it was Gregory who made the decision to return Anthony to the Camp household after a court had made the DCFS his guardian, Gregory reasons that in doing so he placed Anthony in no worse position than if he had taken no action whatsoever.

We believe the fact that the DCFS had been made Anthony's guardian represents a key point of distinction from *DeShaney,* however. Camp had sought to surrender her own guardianship responsibilities because she believed she could not provide him adequate care and supervision. With the agreement of both Camp and the state, the complaint tells us, the court made the DCFS Anthony's guardian. At that juncture, whether the DCFS had a duty to intervene on Anthony's behalf was moot; it had already assumed a role that made it constitutionally liable (at least to some extent) for Anthony's well-being.

That the DCFS had a cognizable duty to protect Anthony as his guardian is reflected in a series of cases holding government officials liable for placing minors in foster homes where they suffered abuse or neglect. Prominent among these is our opinion in *K.H. through Murphy v. Morgan,* 914 F.2d 846 (7th Cir.1990), which post-dates *DeShaney.* In that case, an abused child who had

been removed from the custody of her parents was then shuffled among a series of foster homes in which she continued to suffer abuse and was deprived of the special care she required in view of her history. The child sued DCFS officials, contending that they had deprived her of due process by placing her in foster homes that they knew to be either abusive or unable to care for her properly. We agreed that the plaintiff might have a viable claim in this circumstance. We noted at the outset that the Due Process Clause quite clearly prohibits a public officer from intentionally harming an individual physically without justification, citing, *inter alia, K.H., through Murphy v. Morgan,* 914 F.2d at 848. "The extension [of this principle] to the case in which the plaintiff's mental health is seriously impaired by deliberate and unjustified action is," we observed, "straight-forward." *Id.* We proceeded to distinguish *DeShaney:*

> This is not a "positive liberties" case, like *DeShaney,* where the question was whether the Constitution entitles a child to governmental protection against physical abuse by his parents or other private persons not acting under the direction of the state.... Here, in contrast, the state removed a child from the custody of her parents; having done so, it could no more place her in a position of danger, deliberately and without justification, without thereby violating her rights under the due process clause of the Fourteenth Amendment than it could deliberately and without justification place a criminal defendant in a jail or prison in which his health or safety would be endangered, without violating his rights either under the cruel and unusual punishments clause of the Eighth Amendment (held applicable to the states through the Fourteenth Amendment) if he was a convicted prisoner, or the due process clause if he was awaiting trial. In either case the state would be a doer of harm rather than merely an inept rescuer, just as the Roman state was a doer of harm when it threw Christians to the lions.
>
> The Roman analogy is sound even if one concedes, as one must in the light of *DeShaney,* that the State of Illinois has no constitutional obligation to protect children from physical or sexual abuse by their

parents. The state could have left K.H. to the tender mercies of her parents without thereby violating her rights under the Constitution. But having removed her from their custody the state assumed at least a limited responsibility for her safety.... The Illinois Department of Children and Family Services could not have subjected K.H. to sexual abuse and then defended on the ground that by doing this it did not make her any worse off than she would have been had she been left with her parents.... Once the state assumes custody of a person, it owes him a rudimentary duty of safekeeping no matter how perilous his circumstances were when he was free. The distinction follows the lines of tort law. There is no duty to rescue a bystander in distress, but having rescued him from certain death you are not privileged to kill him. This is not to say that you assume responsibility for his future welfare. You do not. Our point is only that the absence of a duty to rescue does not entitle the rescuer to harm the person whom he has rescued.

914 F.2d at 848–49 (citations omitted). Consistent with our analysis in *K.H.,* cases from our sister circuits also recognize that public officials may be held liable for damages when they place a child in a foster home knowing or having reason to know that the child is likely to suffer harm there. *Doe v. New York City Dep't of Social Servs.,* 649 F.2d 134 (2d Cir.1981), *cert. denied sub nom. Catholic Home Bureau v. Doe,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *Taylor by & through Walker v. Ledbetter,* 818 F.2d 791 (11th Cir.1987) (en banc), *cert. denied,* 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989); *Yvonne L. by & through Lewis v. New Mexico Dep't of Human Servs.,* 959 F.2d 883, 892 (10th Cir.1992); *Norfleet by & through Norfleet v. Arkansas Dep't of Human Servs.,* 989 F.2d 289, 292–93 (8th Cir. 1993).

Indeed, the Supreme Court in *DeShaney* was itself careful to acknowledge and distinguish this line of authority. Although the Court expressed no view on the validity of these cases, it did note that the state's placement of a child in a foster home presented a

question distinct from the state's obligation to intervene in the first instance. 489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9. Thus, as our opinion in *K.H.* reflects, *DeShaney* does not preclude liability when the state, as guardian of a child, places that child in an environment where harm results. *See also DeShaney v. Winnebago County Dep't of Social Servs.,* 812 F.2d 298, 303 (7th Cir.1987), *aff'd,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *Bank of Illinois v. Over,* 65 F.3d 76, 78 (7th Cir.1995).

■ To be sure, there are differences between this case and *K.H.* First among them is that Gregory is not alleged to have placed Anthony in an abusive home, at least not one we would normally think of as abusive. The complaint does not suggest that anyone in the Camp household was prone to strike Anthony, or to molest him, or to deprive him of food or clothing, or to denigrate him emotionally. The focus of *K.H.* was confined to this realm: "The only right in question in this case is the right of a child in state custody not to be handed over by state officers to a foster parent or other custodian, private or public, *whom the state knows or suspects to be a child abuser.*" 914 F.2d at 852 (emphasis in original). Camp moves a step beyond this narrow right; her theory is that Gregory knowingly returned Anthony to a household that could not supervise and guide Anthony to the degree he required. This is a theory that *K.H.* neither addressed nor endorsed. Yet, it is not one we are prepared to reject out of hand. It is no great leap to suggest that the adult custodian of a child is obligated not only to feed and clothe the child and refrain from hurting him either physically or mentally, but to monitor his activities and to step in to prevent him from harming himself. The examples spring easily to mind when the child in question is particularly young—keeping him away from electrical sockets and out of medicine cabinets, for example. As a child grows older we presume, barring some disability, that he is increasingly able to exercise his own judgment and keep himself out of harm's way. Yet, the custodial duty of supervision continues—ensuring that the child returns home at a safe hour, that he attends school, and that he does not abuse drugs or alcohol. Thus, we do not suppose that anyone would think it

appropriate for the DCFS to knowingly place a child with adults who provided food, shelter, and clothing, but who routinely left the child unattended and unsupervised—be that child six years old or sixteen. *See, e.g., In re B.T.,* 204 Ill.App.3d 277, 149 Ill.Dec. 573, 561 N.E.2d 1269 (Ill.App.1990); 720 ILCS 5/12–21.5 (Smith–Hurd 1995 Supp.); 720 ILCS 640/1 (Smith–Hurd 1993). Indeed, DCFS regulations explicitly incorporate the responsibility of supervision in the criteria for foster parents. Ill.Admin.Code tit. 89, § 335.318(c), (d) (1995). Thus, we believe a child placed in the guardianship of the state has a due process right not to be placed by the state with a custodian whom the state knows will fail to exercise the requisite degree of supervision over the child. This is precisely the right that Camp alleges Gregory denied to Anthony; and it is the denial of that right, she further alleges, which resulted in Anthony's death.

In this case, of course, Gregory did not place Anthony with a stranger, but returned him to his aunt. That fact is important for two reasons. First, our cases acknowledge a difference between the state placing a child with a relative and placing him with a foster home. Second, *DeShaney* emphasized that although the state may have been aware of the danger that Joshua faced in his family's home, it had done nothing to create those dangers nor had it done anything rendering Joshua more vulnerable to them. Neither of these points necessarily bars Camp's claim, however, in view of the facts alleged.

In *K.H.,* we acknowledged that "there is indeed a difference between placing a child with a member of her family and placing the child with a foster parent" (914 F.2d at 852), explaining that "[s]tate employees who withhold a child from her family run the risk of being sued by the family for infringing their liberty of familial association, and we do not want to place child welfare workers on a razor's edge—damned if they return the child to its family and damned if they retain custody of the child or place him in a foster home or institution" (*id.* at 853) (citation omitted). That concern is not implicated here, however. Camp, after all, had affirmatively sought to terminate her guardianship

over Anthony because she believed herself unable to provide the degree of care and supervision he required, and the state court apparently agreed. Thus, Gregory faced no peril in removing Anthony from the Camp household—that is exactly what Camp wanted, and it was a desire she unequivocally reiterated when she wrote to Gregory just prior to Anthony's death. Moreover, the DCFS did not relinquish its guardianship over Anthony when Gregory decided to return Anthony to the Camp household rather than seek an alternate placement immediately. Thus, to the extent Gregory and the DCFS bore a duty for Anthony's safety when it was appointed guardian, that duty did not terminate when Anthony was placed again with Camp.

Moreover, given the circumstances leading to the appointment of the DCFS as Anthony's guardian, we believe that the alleged danger he encountered in the Camp household due to Camp's inability to care for him adequately is one that may be attributed to Gregory. Again, we must distinguish this case from *DeShaney.* Had the state simply turned a deaf ear to Camp's pleas in the first instance, it would have no constitutional liability under *DeShaney.* But once the DCFS became Anthony's guardian, Gregory shouldered a responsibility to provide Anthony with a safe environment. When he returned Anthony to an environment he allegedly knew to be inadequate, Gregory might be said to have resurrected the danger that had motivated Camp to surrender guardianship in the first place.

Gregory maintains nonetheless that he could not have violated Anthony's liberty interest because he did nothing to interfere with Anthony's ability to avoid or extricate himself from dangerous situations or with Camp's ability to help him do so. This argument derives from a series of cases recognizing that state officials who might not otherwise have a cognizable duty to rescue a person from harm expose themselves to liability when they prevent others from coming to that individual's aid. *See Ross v. United States,* 910 F.2d 1422, 1432–33 (7th Cir.1990) (collecting cases); *see also DeShaney,* 489 U.S. at 200, 109 S.Ct. at 1005; *Pinder v.*

*Johnson,* 54 F.3d 1169, 1174–75 (4th Cir. 1995) (en banc); *Johnson v. Dallas Indep. School Dist.,* 38 F.3d 198, 201–02 (5th Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1361, 131 L.Ed.2d 218 (1995). Arguing the converse of that principle here, Gregory suggests that because he did nothing to confine Anthony in a physically harmful situation, and because nothing he did prevented Camp from coming to Anthony's aid and extricating him from danger, he in no way deprived Anthony of liberty. This argument is misplaced. Even if we assume that Gregory's conduct in no way interfered with the ability of any private citizens (including Camp and Anthony himself) to "rescue" Anthony from the dangers that culminated in his death, that assumption does not detract from the affirmative duty to intervene on Anthony's behalf which sprang from the DCFS being made his guardian.

This is not a case in which a public official is charged with hampering private efforts to aid a victim, but rather one based on the official's failure, as his appointed guardian, to come to that victim's aid himself. At the same time, the notion that Gregory did nothing which interfered with Camp's efforts to protect Anthony or that precluded Anthony from helping himself is not necessarily accurate. As far as Anthony is concerned, it is not at all implausible to assume that as a minor, and particularly one with special educational and custodial needs, he may not have possessed the degree of maturity necessary to extricate himself from potentially harmful situations. And, indeed, that is the crux of Camp's claim—that Anthony required a heightened level of supervision, guidance, and instruction that she could not provide. Furthermore, if what Anthony really needed was a different caretaker, then Camp's own attempts to secure him one presumably were halted once the court appointed the DCFS Anthony's guardian. At that juncture, we assume, Camp was not free simply to relocate Anthony to a different household; nor, needless to say, was Anthony himself able to do so as an unemancipated minor. That ability had been officially turned over to Gregory; and at a minimum, we may suppose that Camp believed he would shoulder the burden of either finding a different place-

ment for Anthony or supplementing Camp's efforts by providing the educational and counseling references she sought.

Camp did relinquish her guardianship over Anthony voluntarily, whereas a number of foster care cases have stressed the *involuntary* character of the change in guardianship as key to recognizing a due process claim. *See Taylor*, 818 F.2d at 797; *Milburn by Milburn v. Anne Arundel County Dep't of Social Servs.*, 871 F.2d 474, 476 (4th Cir.), *cert. denied*, 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 106 (1989); *see also Walton v. Alexander*, 44 F.3d 1297, 1303–04 (5th Cir.1995) (en banc). But in this case Camp sought to surrender guardianship allegedly because she was unable to care for Anthony adequately, the court presumably agreed when it granted her request, and the state did assume guardianship. We are unwilling to decree that simply because Camp, as opposed to the state, initiated the transfer of guardianship, under no set of facts could a state official be liable for a subsequent deprivation of due process. *See Walton*, 44 F.3d at 1309 (special concurrence) ("The question is not so much *how* the individual got into state custody, but to what extent the state exercises dominion and control over that individual.") (emphasis in original).

We also find it significant that Gregory allegedly misrepresented to the Illinois court that all was well with Anthony's continued residence in the Camp household. If, in fact, he did so, he may have effectively prevented any independent assessment by that court of whether the concerns that had led to the DCFS' guardianship were being addressed. Camp's entreaties to Gregory suggest that nothing had changed; but Gregory allegedly concealed that fact from the court. Thus, in a very real sense, it could be said (if the facts bear out the complaint) that Gregory did frustrate the efforts of other private persons and public officials to improve Anthony's situation.

C. Duty to Protect Anthony from Violence Outside of the Home

Whether Gregory's duty extended to dangers outside of the household to which he had returned Anthony is a more novel and difficult question. Gregory argues that this aspect of Camp's claim makes the case even more compelling for him than *DeShaney*. In one sense he is no doubt correct. Government officials can and routinely do make assessments of the adults with whom children under the state's guardianship are placed. Thus, as we recognized in *K.H.*, if a DCFS caseworker places a child in a foster home where he knows the child will likely suffer abuse, he can be held liable. But to place on the caseworker a duty to evaluate and protect a child from dangers outside of the household is a great step beyond that. Given the widespread escalation of violence we have witnessed over the years, many a child may be in danger of injury at the hands of strangers when he is outside of his home, and public officials cannot be deemed constitutionally obligated to shield a child from all such dangers beyond the reasonable control of his parent or foster parent any more than the parents themselves can be.

Even so, a parent does not relinquish all responsibility once a child leaves the house. No one would think it reasonable, for example, for a parent to knowingly permit a toddler to wander the streets at will, confronting a gamut of risks from inattentive motorists to Mr. or Ms. Stranger Danger. We expect, instead, that the parent will have the child in hand, protecting him from danger that the child is otherwise unequipped to avoid. As the child matures, the degree to which his parent is expected to supervise his activities lessens, but it does not cease altogether. We still expect parents to see to it that their children attend school, obey statutory curfews, and stay out of trouble. Parents are not the insurers of their children's conduct, but when they fail to exercise a reasonable degree of supervision, they can be held liable for their omissions. *See, e.g., Restatement (Second) of Torts* § 316 (1965); 720 ILCS 640/1.

■ Commensurate with the parental obligation to supervise a child's activities outside the home is a duty on the part of the state not to place one of its charges with an adult that it knows will not or cannot exercise that responsibility. The DCFS regulations governing placement with relative care-

takers recognize that responsibility, specifying as a pre-condition to approval that the DCFS staff must find that "supervision of the related child(ren) can be assured at all times including times when the related caregiver is employed or otherwise engaged in activity outside of the home." Ill.Admin.Code tit. 89 § 335.202(c)(7) (1995). Thus, we believe that when a DCFS caseworker places a child in a home knowing that his caretaker cannot provide reasonable supervision, and the failure to provide that degree of supervision and care results in injury to the child outside of the home, it might be appropriate, depending upon the facts culminating in the injury, for the caseworker to be held liable for a deprivation of liberty.

Liability must, nonetheless, be confined to what we believe will be a very narrow range of cases. Without attempting to identify all of the factors that might limit this category, we mention a few that come readily to mind. First, before a DCFS worker or other state official can be held liable for a placement decision, he must, as we indicated in *K.H.*, have failed to exercise bona fide professional judgment. 914 F.2d at 854. Second, a caretaker can be expected only to provide a reasonable degree of supervision to a minor in her care. Extraordinary efforts to protect a child from dangers outside of the home might save the child from injury when reasonable measures would not, but only when the caretaker's efforts fall short of the reasonable could the official responsible for placing the child with that caretaker be held liable for the resulting injury. Moreover, the injury suffered must, we believe, be one reasonably foreseeable to the official. A caseworker who is aware that the caretaker he selects will not supervise the child appropriately may not be able to foresee the particular injury that will result from the lack of supervision. If that is the case, then it would be inappropriate to impose liability on the caseworker. But here, Camp alleges that she had placed Gregory on notice of the particular problems resulting from her inability to supervise and guide Anthony to the degree necessary. Finally, we stress that there must be a sufficient causal link between the failure to provide reasonable su-

pervision and the injury. If Anthony were killed at random in a drive-by shooting while he was out for a walk after curfew, for example, there would be no basis to impose liability on Gregory even if he knew Camp was unable to supervise him reasonably. Likewise, if Anthony was so bent on engaging in dangerous activity that even reasonable efforts to restrain him from doing so would not have prevailed, it would be untenable to hold Gregory liable for his decision to leave him with Camp.

Because the complaint does not detail the particular circumstances of Anthony's death, we cannot say one way or another whether this case would fit the criteria we have articulated. In light of our conclusion below that Gregory is entitled to qualified immunity, it does not matter; no factual development of the case is required. It may be, as Gregory has argued so vigorously, that Anthony was killed as the result of his own knowing decision to involve himself in gang activity. The complaint's reference to Anthony's tendency to place himself in dangerous situations certainly is consistent with that scenario; and if that is what occurred, then Gregory's alleged misdeeds likely would not support a finding of liability. On the other hand, if Anthony's death was the proximate result of Camp's inability to supervise him to a reasonable degree, if (as alleged) Gregory knew Camp could not supervise Anthony adequately, and if the circumstances of Anthony's death were reasonably foreseeable to Gregory, then barring a finding of qualified immunity we believe that Gregory might be held liable for his decision to place Anthony with Camp.

For all of these reasons, we believe that the allegations of Camp's complaint did state a viable due process claim against Gregory. We wish to emphasize, however, the limited nature of our holding. The details provided by the amended complaint are few; and further factual development in this case might readily place this case outside the quite narrow category of circumstances in which a state official might be liable for a deprivation of due process. If accurate, the suggestion that Anthony was shot by a private citizen, perhaps in yet another tragic instance of gang violence, might well doom the action if

qualified immunity did not. But this assertion, on which the state relies so heavily in defending Gregory, is not supported by the record. Our review is restricted to the allegations before us (*see Reed v. Gardner*, 986 F.2d 1122, 1124 (7th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993)) and these do not reveal just how Anthony died. What is alleged is that the state had, by court order, assumed guardianship over Anthony, that Gregory left Anthony with Camp, and that despite Camp's letter informing him that Anthony was in danger and required a different placement, Gregory falsely represented to the Illinois court that all was "fine." Because we can hypothesize facts consistent with these allegations which, if proven, would make out a valid due process claim against Gregory (*see Graehling v. Village of Lombard*, *supra*, 58 F.3d at 297), we cannot say that the amended complaint failed to state a claim upon which relief could be granted.

### D. Qualified Immunity

▪▪▪ A public official who has deprived someone of his constitutional right may nonetheless enjoy immunity from an award of damages if his actions were "objectively reasonable, meaning that [if] '[his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,'" he is immune from an action for civil damages. *Supreme Video, Inc. v. Schauz*, 15 F.3d 1435, 1438–39 (7th Cir.1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Thus:

> When the law is settled on a particular point, public employees are expected to conform their conduct accordingly, and they may be held liable when they do not. On the other hand, they "need not predict [the law's] evolution, need not know that in the fight between broad and narrow readings of a precedent the broad reading will become ascendant." *Greenberg v. Kmetko*, 922 F.2d 382, 385 (7th Cir.1991).

*Smith v. Fruin*, 28 F.3d 646, 650 (7th Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995). We must therefore decide whether a reasonable public official in Gregory's position would have realized in 1991 that he could not knowingly place a child over whom the state has been made guardian with a caretaker who cannot provide a reasonable degree of supervision and intervention in the child's activities. We believe he would not.

Certainly it was clear by 1991 that a child had a right not to be placed with an abusive caretaker. *K.H.*, a 1990 decision, settled that issue in this circuit. However, Camp has cited no decision to us recognizing a constitutional right to adequate supervision and guidance. There are hints in the cases that caseworkers must not place children with caretakers who will abuse or neglect them. *E.g., K.H.*, 914 F.2d at 853. Neglect certainly could be construed to include not only the failure to provide a child with the necessities, but the degree of supervision, instruction, and involvement necessary to steer the child clear of dangerous activities. Yet, no case cited to us does so. Thus, at best a public official would have had to predict that cases such as *K.H.* would be construed expansively in order to anticipate our holding today. Certainly an official could be charged with knowledge that it was impermissible to misrepresent facts to a court, as Camp alleges Gregory did, but he could not have predicted civil liability under the due process clause for the placement decision itself. This is a classic instance in which a public official is entitled to qualified immunity. *Greenberg*, 922 F.2d at 385.

## IV. PROCEDURAL DUE PROCESS CLAIM

Camp suggests on appeal that she may have a claim for a violation of Anthony's procedural due process rights, in addition to his right to substantive due process. It may well be, as Gregory argues, that the circumstances of this case do not fit comfortably within the procedural due process framework, as the partial dissent in *Taylor* suggests. 818 F.2d at 822. The focus of Camp's complaint is on the deprivation of Anthony's liberty, but procedural due process is concerned not with the deprivation *per se*, but with the mistaken or unjustified deprivation of a constitutional right. *Carey v. Piphus*,

435 U.S. 247, 259, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1978). Better procedures at DCFS might have reduced the chance that Anthony would be placed in a dangerous environment, but we certainly do not understand Camp to argue that Gregory would ever have been justified in knowingly placing Anthony in such an environment and thereby depriving him of his liberty. Yet, the procedural due process inquiry assumes that the individual can be deprived of the particular right in question and asks only what procedures must be followed in doing so. *E.g., Fittshur v. Village of Menomonee Falls,* 31 F.3d 1401, 1405 (7th Cir.1994); *see Taylor,* 818 F.2d at 822 (dissent); *cf. Mid–American Waste Sys., Inc. v. City of Gary, Indiana,* 49 F.3d 286, 290–91 (7th Cir.1995). In any event, neither Camp's complaint nor her briefs have adequately identified any respect in which the procedures the DCFS employed were unfair. Indeed, the record suggests that Camp never attempted to articulate a procedural due process theory below: neither the original nor the amended complaint explicitly mentions procedural due process, and in opposing dismissal, Camp never invoked procedural due process. *See* R. 17 at 8, R. 25 at 3–4, 6. Accordingly, we deem any theory grounded in procedural due process to have been waived. *Harris Trust & Sav. Bank v. Provident Life & Accident Ins. Co.,* 57 F.3d 608, 614 (7th Cir.1995).

## V. CONCLUSION

Although we believe that Camp's complaint alleged facts sufficient to state a claim for the deprivation of Anthony's liberty in violation of his Fourteenth Amendment right to substantive due process, we also conclude that Gregory is entitled to qualified immunity. Because Camp did not argue below that her complaint stated a separate procedural due process claim, we deem any such argument waived and need not consider its merits.

AFFIRMED.