**Ronald E. STEVENS, guardian of the Person and Estate of Bradley Edwin Stevens, a Disabled Person, and Ronald E. Stevens, Individually, Plaintiffs,**

**v.**

**Richard UMSTED, Defendant.**

**No. 95–3172.**

United States District Court,
C.D. Illinois,
Springfield Division.

April 1, 1996.

Jeffrey K. Clapper, Danville, IL, M. John Hefner, Jr., Mattoon, IL, for plaintiffs.

Brian J. Dees, Springfield, IL, for defendant.

## OPINION

RICHARD MILLS, District Judge:

First, the background.

Bradley Edwin Stevens is visually impaired and developmentally disabled. Between 1984 and June of 1994, Bradley was a student at the Illinois School for the Visually Impaired (ISVI) in Jacksonville, Illinois and during that time, Defendant Richard Umsted was the Superintendent of ISVI.

■ The facts giving rise to Plaintiffs' claims are stated thus in the First Amended Complaint:

5. That during the period of time between 1984 through June 1994, the exact times and dates unknown to Plaintiff, BRADLEY E. STEVENS was subject to numerous physical assaults of a sexual nature by a fellow student or students of said facility.

6. Some of the aforementioned sexual assaults were perpetrated upon Plaintiff, BRADLEY E. STEVENS, at times after Defendant, RICHARD UMSTED, had actual knowledge of some of the prior sexual assaults upon Plaintiff, BRADLEY E. STEVENS, and, in spite of such knowledge, Defendant, RICHARD UMSTED, failed to provide Plaintiff, BRADLEY E. STEVENS, with a reasonably safe environment in that he:

a. Failed to take reasonable steps to prevent sexual assaults upon Plaintiff, BRADLEY E. STEVENS.

b. Failed to inform Plaintiff's guardian of the assaults.

c. Failed to remove the perpetrators of the sexual assaults from the school.

d. Failed to place Plaintiff, Bradley E. Stevens, in a residential facility offering a more secure environment.

In addition to alleging these specific derelictions of Superintendent Umsted's duty, the Complaint alleges that Umsted was grossly negligent. As a direct and proximate result of the gross negligence, Bradley was allegedly "deprived of his Constitutional right to be secure in his person and to be placed in a safe environment free from such sexual assaults." It is alleged that the ISVI Superintendent violated Bradley's rights under color of law, and thereby caused damage to Plaintiffs, who now seek monetary relief.

We are here on Umsted's motion to dismiss.

## I. STANDARD FOR MOTIONS TO DISMISS

In ruling on a motion to dismiss, the Court "must accept well pleaded allegations of the complaint as true. In addition, the Court must view these allegations in the light most favorable to the plaintiff." *Gomez v. Illinois State Board of Education,* 811 F.2d 1030, 1039 (7th Cir.1987). Although a complaint is not required to contain a detailed outline of the claim's basis, it nevertheless "must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984), *cert. denied,* 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). Mere conclusions, without supporting factual allegations, are insufficient to support a claim for relief. *Cohen v. Illinois Institute of Technology,* 581 F.2d 658, 663 (7th Cir.1978), *cert. denied,* 439 U.S. 1135, 99 S.Ct. 1058, 59 L.Ed.2d 97 (1979). Dismissal is not granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

## II. ANALYSIS

Umsted raises two issues in his motion to dismiss. First, Umsted argues that Bradley Stevens had no right to have Umsted protect him from assaults perpetrated by other private individuals. Second, Umsted argues that even if Bradley had such a right, it is sufficiently novel that Umsted is entitled to qualified immunity. The Court concludes below that Bradley did not have a constitutional right to have Umsted protect him from assaults perpetrated by other private individuals. Additionally, the Court concludes that even if Umsted violated Bradley's constitutional rights, Umsted is entitled to immunity.

### A. *Duty to Protect*

Plaintiffs proceed under 42 U.S.C. § 1983. One element of a claim under § 1983 is that the Plaintiff must have "held a constitutionally protected right." *Schertz v. Waupaca County,* 875 F.2d 578, 581 (7th Cir.1989); *see also Brown v. City of Lake Geneva,* 919 F.2d 1299, 1301 (7th Cir.1990) ("In order to state a claim under 42 U.S.C. Section 1983, plaintiff must show (1) action taken under color of state law, bringing about (2) a deprivation of a right protected by the constitution."). The First Amended Complaint alleges that Umsted injured Plaintiffs because he failed to provide a safe environment for Bradley, who was a "resident student" at ISVI and "was under the direct control, care, custody and supervision of Defendant." The question for the Court to decide is whether, by failing to provide a safe environment for Bradley, Umsted violated Bradley's constitutional rights.

Generally, a person has no constitutional right to have the government protect him from injuries caused by private actors.

The government is not under a constitutional duty to protect an individual from harm caused to him by other private individuals. However, in some circumstances the government's failure to protect an individual from private harm may result in an injury to the individual that is attributable to the state and that involves a substantive violation of a constitutional guarantee.

John E. Nowak & Ronald D. Rotunda, Constitutional Law 477 (4th ed.1991).

### 1. *DeShaney*

The central case defining governmental liability, under the United States Constitution, for acts committed by private individuals is *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney,* the Supreme Court rejected a claim that a government agency had a constitutional duty to protect a child from an abusive parent because of an alleged "special relationship" between the agency and the child. 489 U.S. at 201, 109 S.Ct. at 1006. The Court's holding, that the plaintiff could not recover under § 1983, is not nearly as important as what the Court said about when a plaintiff could recover

from the government for acts committed by private individuals.

The Supreme Court stated that the Due Process Clauses "generally confer no affirmative right to governmental aid" and that "[a]s a general matter ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." [1] *Id.* at 196–97, 109 S.Ct. at 1004. The petitioners argued that "even if the Due Process Clause imposes no affirmative obligation on the State to provide the general public with adequate protective services, such a duty may arise out of certain 'special relationships' created or assumed by the State with respect to particular individuals." *Id.* at 197, 109 S.Ct. at 1004.

The Court rejected the petitioners' "special relationship" argument. The Court conceded that in two circumstances it had found that the government did have an affirmative constitutional duty to protect particular individuals. Specifically, the Court cited *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) and *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

The *DeShaney* Court summarized the holdings of *Estelle* [2] and *Youngberg* [3]:

Taken together, [these cases] stand only for the proposition that when the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. See *Youngberg v. Romeo, supra* at 317, 102 S.Ct. at 2459 ("When a person is institutionalized—and wholly dependent on the State[,] ... a duty to provide certain services and care does exist"). The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

489 U.S. at 200, 109 S.Ct. at 1005. If a duty to provide services exists, the Court ex-

1. The Supreme Court explained why the Constitution does not require the government to protect individuals from privately caused harm:

   [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means. Nor does history support such an expansive reading of the constitutional text. Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was intended to prevent government "from abusing [its] power, or employing it as an instrument of oppression,".... Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes.
   489 U.S. at 195–96, 109 S.Ct. at 1003 (citations omitted).

2. In *Estelle*, the Court held that the Eighth Amendment, applicable to the states through the Fourteenth Amendment Due Process Clause, required states to provide adequate medical care to incarcerated prisoners. Specifically, the Court concluded that "elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." 429 U.S. at 103, 97 S.Ct. at 290.

3. In *Youngberg*, the Supreme Court held that states must provide involuntarily committed mental patients in state facilities the services necessary to ensure their reasonable safety. In *Youngberg*, Nicholas Romeo, a profoundly retarded individual was admitted to a state mental facility on a permanent basis. Romeo was admitted at the request of his mother, who petitioned the Philadelphia County Court of Common Pleas to admit Nicholas because she was unable to care for him or control his violent behavior. 457 U.S. at 309, 102 S.Ct. at 2454–55. The state court ordered Nicholas committed, pursuant to the involuntary commitment provision of the Pennsylvania code. *Id.* at 310, 102 S.Ct. at 2455. On these facts, the Supreme Court held simply: "If it is cruel and unusual punishment to hold convicted criminal in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions." *Id.* at 315–16, 102 S.Ct. at 2458.

plained, it exists because the state has acted by "restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty." 489 U.S. at 200, 109 S.Ct. at 1006.

The Supreme Court distinguished DeShaney's case from *Youngberg* and *Estelle* because the state was at best only aware of the dangers that faced the child but the state "played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201, 109 S.Ct. at 1006. The Court also rejected the petitioners' argument that the state should be liable because it had once taken Joshua DeShaney into custody because the state had not placed Joshua in a worse position than if the state had not acted at all. In a footnote, the Court acknowledged lower court cases holding states liable for mistreatment of foster children at the hands of their foster parents. Although it declined to express a view on those cases, the Court noted that the situation of a foster child "might be sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." *Id.* at 201 n. 9, 109 S.Ct. at 1006 n. 9.

The Supreme Court concluded with a note that acknowledges the difficulty posed by cases such as Joshua DeShaney's and Bradley Stevens':

Judges and lawyers, like other humans, are moved by natural sympathy in a case like this to find a way for Joshua and his mother to receive compensation for the grievous harm inflicted upon them. But before yielding to that impulse, it is well to remember once again that the harm was inflicted not by the State of Wisconsin, but by Joshua's father. The most that can be said of the state functionaries is that they stood by and did nothing when suspicious circumstances dictated a more active role for them.

*Id.* at 203, 109 S.Ct. at 1007. Instead of Constitutional relief, however, the Supreme Court left to state tort law the problem of providing compensation for people such as Joshua DeShaney.

### 2. Parameters of the Duty to Protect

Since *DeShaney*, lower courts have differed in approach and result in a variety of cases. The courts generally agree that public schools are not liable for injuries to one student caused by another.[4] The courts disagree, however, whether states are liable for injuries caused to voluntary state mental patients.[5]

---

**4.** *J.O. v. Alton Community Unit School District 11,* 909 F.2d 267, 272 (7th Cir.1990) ("We do not suggest that prisoners and [involuntarily committed] mental patients are an exhaustive list of all persons to whom the state owes some affirmative duties, but the government, acting through local school administrations, has not rendered its schoolchildren so helpless that an affirmative constitutional duty to protect arises."); *see also Leffall v. Dallas Independent School District,* 28 F.3d 521 (5th Cir.1994) (holding a school not liable when one student shot another at a school sponsored school dance); *Graham v. Independent School District No. I–89,* 22 F.3d 991 (10th Cir. 1994) (holding that a school cannot be liable, even for known or foreseeable hazards caused by third parties, because no custodial relationship existed); *Dorothy J. v. Little Rock School District,* 7 F.3d 729 (8th Cir.1993) (holding that mandatory school attendance is not sufficiently restrictive to trigger a duty to protect); *Maldonado v. Josey,* 975 F.2d 727 (10th Cir.1992) (holding that compulsory school attendance did not trigger a duty to protect students), *cert. denied,* 507 U.S. 914, 113 S.Ct. 1266, 122 L.Ed.2d 662 (1993); *D.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364, 1373 (3d Cir.1992) (en banc) (holding that "no special relationship based upon a restraint of liberty exists" in the context of public school attendance), *cert. denied,* 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993). *But cf. Leffall,* 28 F.3d at 529 (stating that school officials should be liable for violations of student's due process rights when the students were harmed not by classmates but by teachers or other school staff: "The special relationship doctrine is properly invoked in cases involving harms inflicted by third parties, and it is not applicable when it is the conduct of a state actor that has allegedly infringed a person's constitutional rights."); *Doe v. Taylor Independent School District,* 15 F.3d 443 (5th Cir.1994), *cert. denied sub nom Lankford v. Doe,* —— U.S. ——, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994).

**5.** *Compare Fialkowski v. Greenwich Home for Children, Inc.,* 921 F.2d 459 (3d Cir.1990) (holding that a resident of a state home had no due process right to protection because he had been placed there at his parents' instance and was apparently free to leave) *and Monahan v. Dorchester Counseling Center, Inc.,* 961 F.2d 987, 993 (1st Cir.1992) ("Although the Commonwealth may have played some role in the harm, it did so only because Monahan voluntarily availed him-

The Seventh Circuit has held that when the state takes custody of a child and places her in a foster home, the state has a constitutional duty not to place the child in a home where she will be subject to abuse. *See K.H. through Murphy v. Morgan,* 914 F.2d 846 (7th Cir.1990). The Seventh Circuit has also recently "a child placed in the guardianship of the state has a due process right not to be placed by the state with a custodian whom the state knows will fail to exercise the requisite degree of supervision over the child." *Camp v. Gregory,* 67 F.3d 1286, 1294 (7th Cir.1995).

No court has yet held that a full time, residential student at a special state-run school has a constitutional right to a safe environment.[6] In fact, the only court to rule on the question held that the superintendent of such a school has no duty to protect. *Walton v. Alexander,* 44 F.3d 1297 (5th Cir. 1995) (en banc). But, as this Court noted in its earlier order, the reasoning of the majority in *Walton*[7] has been discredited by the Seventh Circuit in *Camp.*[8] The Court, therefore, has no reliable precedent to rest upon.

Although the Court cannot safely follow the rationale of *Walton,* the outcome of that

self of the Commonwealth service.... Thus, the Commonwealth's actions, while possibly negligent or even willfully indifferent or reckless, did not take on the added character of violations of the federal Constitution.") *with Buffington v. Baltimore County,* 913 F.2d 113, 119 (4th Cir.1990) ("Nothing in the [*DeShaney*] Court's rationale for finding that some affirmative duty arises once the state takes custody of an individual can be read to imply that the existence of the duty somehow turns on the reason for taking custody."), *cert. denied,* 499 U.S. 906, 111 S.Ct. 1106, 113 L.Ed.2d 216 (1991) *and Kolpak v. Bell,* 619 F.Supp. 359, 378 (N.D.Ill.1985) ("[W]hile the court need not consider the constitutional significance of a voluntary admission on this motion, there is much logic in the cases that find voluntary and involuntary residents entitled to the same constitutional rights to a safe environment.").

6. The Fifth Circuit is the only circuit with a valid opinion on the question of whether a residential student has the requisite special relationship with the state to trigger the state's obligation to protect against abuse by private parties. The Eleventh Circuit had held that a residential student had a special relationship with the state triggering the state's duty to protect, *Spivey v. Elliott,* 29 F.3d 1522 (11th Cir.1994), but the panel withdrew that opinion upon reconsideration. *Spivey v. Elliott,* 41 F.3d 1497 (11th Cir. 1995).

7. In *Walton,* a student of the Mississippi School for the Deaf who was sexually assaulted by another student sued the school's superintendent. After the initial assault, the students were suspended. After they returned, they were placed in separate dormitories. Budgetary considerations later forced the school to house the students in the same dormitory, and Walton was again assaulted. 44 F.3d at 1299–1300.

While Walton was at the Mississippi School for the Deaf, he was "under the twenty-four hour custody of the School and subjected to strict rules concerning what they were allowed to do and when they could come and go." *Id.* at 1299.

The Fifth Circuit rejected Walton's claim, stating that "Walton's willful relinquishment of a small fraction of liberty simply is not comparable to that measure of almost total deprivation experienced by a prisoner or involuntarily committed mental patient. Nor do the facts establish that the state, through its affirmative acts, held Walton at the School involuntarily and against his will." *Id.* at 1305. Three judges concurred in the Fifth Circuit's decision, arguing the appropriate inquiry was into the exact extent of control exercised by the state over the plaintiff. *Id.* at 1309–10 (Parker, J., concurring specially).

8. In its order dismissing the original Complaint, this Court stated:

The *Walton* decision is certainly persuasive precedent, which this Court might ordinarily be inclined to follow. However, the Seventh Circuit recently decided a case involving similar issues to those presented in the instant case. In *Camp v. Gregory,* 67 F.3d 1286 (7th Cir.1995), the Seventh Circuit held that "a child placed in the guardianship of the state has a due process right not to be placed by the state with a custodian whom the state knows will fail to exercise the requisite degree of supervision over the child." *Id.* at 1296. The court found that as the child's guardian, the state retained some responsibility for the child's care even though the child was in the custody of a private person. *Id.* at 1296–1298. In its opinion, the court rejected the approach taken by the Fifth Circuit in *Walton:* "We are unwilling to decree that simply because Camp, as opposed to the state, initiated the transfer of guardianship, under no set of facts could a state official be liable for a subsequent deprivation of due process." *Id.* at 1296.

Given the Seventh Circuit's reluctance to rely solely on voluntariness to determine whether a due process right to a safe environment exists, the Court declines Defendant's invitation to dismiss the Complaint based on the Fifth Circuit's rationale in *Walton....*
Order of Nov. 21, 1995 at 5–6 (citations have been modified).

case is sound. The Seventh Circuit's opinion in *Camp* instructs that voluntariness alone is not a sufficient basis to deny the existence of a duty to protect. 67 F.3d at 1296. But the Supreme Court in *DeShaney* explained that the state must take some action which causes an individual to lose his ability to protect himself before the state's duty to protect arises.[9] Courts have found that judgments of conviction leading to a sentences of incarceration, orders committing people to state mental institutions, and decrees removing children from parental custody and making them wards of the state are state actions sufficient to trigger a duty to protect.

█ The Court finds that taking custody of a student at a special state-run school does not constitute the same sort of deprivation of liberty as incarceration or institutionalization. *Cf. DeShaney*, 489 U.S. at 201 n. 9, 109 S.Ct. at 1006. In this case, the central allegation is that Umsted had "direct control, care, custody and supervision" of Bradley Stevens. But the First Amended Complaint does not allege any state action that led to Bradley being placed at the ISVI. Instead, Bradley's parents still had legal custody of him; Bradley's father was his legal guardian. Plaintiffs do not allege that Bradley had been committed (involuntarily or otherwise) or that he had been incarcerated. Therefore, the Court finds that the state has not taken an action sufficient to trigger a constitutional duty to protect Bradley.

### B. *Immunity*

█ The Amended Complaint does not specify whether Superintendent Umsted is sued in his individual or official capacity. Apparently assuming that Plaintiffs intended to make an individual capacity claim, Umsted raises the defense of qualified immunity.[10] The Seventh Circuit has instructed courts to construe § 1983 claims as against defendants in their official capacities if the complaint fails to identify which capacity a defendant is sued in. *Kolar v. County of Sangamon*, 756 F.2d 564, 568 (7th Cir.1985). Qualified immunity does not apply to official capacity suits. But the Eleventh Amendment does, and in this case, the Eleventh Amendment would presumably bar Plaintiffs' claim for damages. *See Estate of Porter by Nelson v. Illinois*, 36 F.3d 684 (7th Cir.1994).

Even if Plaintiffs had sued Umsted in his individual capacity, qualified immunity would apply. In *Camp*, the Seventh Circuit stated that the case was the "classic instance in which a public official is entitled to qualified immunity," 67 F.3d at 1298, because no case had previously recognized the constitutional duty the court had just found. The court in *Camp* expanded the law less than this Court would by allowing this case to proceed.[11]

9. *DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1005–06 ("In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of Due Process Clause, not its failure to act to protect his liberty interest against harms inflicted by other means.") (footnote omitted).

10. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). To determine whether officials are immune, the Court must determine whether "the law was clear in relation to the specific facts confronting the public official when he acted." *Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th

Cir.1988) (en banc), *cert. denied*, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988). As the Seventh Circuit in *Camp* stated:

> A public official who has deprived someone of his constitutional right may nonetheless enjoy immunity from an award of damages if his actions were "objectively reasonable, meaning that [if] '[his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,' " he is immune from an action for civil damages. *Supreme Video, Inc. v. Schauz*, 15 F.3d 1435, 1438–39 (7th Cir.1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 [102 S.Ct. 2727, 2738, 73 L.Ed.2d 396] (1982)).

*Camp*, 67 F.3d at 1298 (alterations in original) (parallel citations omitted).

11. In *Camp*, the Seventh Circuit further defined the State's duty to foster children. By allowing this case to proceed, this Court would add to the list of individuals whom states owe a duty to protect.

Thus, this case is even more appropriate for qualified immunity than *Camp*.

### III. CONCLUSION

Plaintiffs make a claim for damages against Umsted under the United States Constitution. But the United States Constitution is not the proper tool with which to extract from the state recompense for harms caused by a private person under these circumstances. Furthermore, the duty that Plaintiffs claim existed is so novel that, if the Court found it to exist, Umsted would be entitled to qualified immunity.

*Ergo,* Defendant's Motion to Dismiss is ALLOWED.

This case is DISMISSED with prejudice.

CASE CLOSED.