# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 98-1732

_____

S.S., by and through her Next     *
Friend and guardian ad litem,     *
Ellen D. Jervis,     *
    *
       Plaintiff - Appellant,     *
    *
       v.     * Appeal from the United States
    * District Court for the
Michelle McMullen; Sherry Jacoby;     * Western District of Missouri.
Kathleen Barnett;     *
    *
       Defendants - Appellees,     *
    *
Cynthia M. Montgomery, Ph.D.     *
    *
       Defendant.     *

_____

Submitted: September 24, 1998
Filed: July 21, 1999

_____

Before WOLLMAN, JOHN R. GIBSON, and MORRIS S. ARNOLD, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

In this 42 U.S.C. § 1983 action, S.S., now an eight-year-old girl, appeals the district court's dismissal of her claims against the defendants. S.S. alleged that three employees of the Missouri Division of Family Services violated her substantive due

process right to bodily integrity, or, as she terms it, "to be reasonably safe from harm." Her complaint charged that the defendants placed S.S. in her father's custody while knowing that her father associated with a convicted pedophile -- Joel Griffis --  to whom S.S. might be exposed.  Some three months after the defendants recommended that custody of S.S. be transferred to her father, S.S. was sodomized by Griffis.  Five months later, S.S. filed this lawsuit through her next friend and guardian ad litem, Ellen D. Jervis.  Relying upon DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989), the district court dismissed S.S.'s suit.  We reverse and remand for further proceedings.

Because we are considering a motion to dismiss, we must accept as true the facts alleged in S.S's complaint.  Haberthur v. City of Raymore, 119 F.3d 720, 723 (8th Cir. 1997).  While not quite three years old, S.S. was taken into the Division's protective custody in January 1994.  Several occurrences led to the transfer of S.S. to the Division's custody.  For instance, S.S.'s father[1] had allegedly smeared human feces onto her face.  Further, S.S. had been locked in her bedroom for periods of time by her parents and was sexually abused by an unknown person.  The authorities had also substantiated several child abuse hotline calls regarding the parents' neglect of S.S.  On April 5, 1994, the Circuit Court of Cass County, Missouri, placed S.S. in the Division's permanent custody for placement in foster care.

Defendants Michelle McMullen and Sherry Jacoby are social workers in the Division and were assigned to S.S.'s case in February and May of 1994, respectively. Defendant Kathleen Barnett supervised both McMullen and Jacoby at all times relevant to this lawsuit; she received and approved all dictation, correspondence, and written reports regarding S.S.  While S.S. was in the Division's custody, McMullen permitted

---

[1]In order to shield S.S.'s identity, we have avoided referring to her father by name.

S.S.'s father to visit S.S. under McMullen's supervision. Griffis was present during three of these visits: July 18, 1995, August 18, 1995, and August 25, 1995.

The defendants later learned that Griffis was a child molester and that he presented a danger to S.S. First, McMullen received an anonymous phone call on September 20, 1995, stating that a man named "Joel" had been convicted of numerous sex offenses and had "been around" S.S. and her father. Second, McMullen learned from numerous sources that S.S.'s father had allowed contact between Griffis and S.S. on nine occasions between October 1995 and August 1996. Third, in May 1996, McMullen received a copy of a psychological evaluation of S.S.'s father. In it, Dr. Gregory Sisk expressed concern that returning S.S. to her father's custody might endanger her welfare. Specifically, Dr. Sisk stated that a child in S.S.'s father's care "could be at risk of abuse/neglect due to his beliefs about child rearing"; that the father "seems dangerously sympathetic with a known child sexual offender, which would appear to be a very risky behavior"; and that "plans toward reunification should proceed cautiously." Fourth, in July 1996, McMullen became aware of an anonymous child abuse hotline call stating that S.S. "had a rash 'down there' [and] that there is also a man who hangs around the household that S.S. calls grandpa and that he used to be a child molester." Although McMullen investigated this allegation by questioning S.S. at day care and visually examining her genital area, she neither contacted law enforcement authorities nor arranged to have S.S. examined by a medical professional. Fifth, McMullen received a telephone call from Griffis on August 13, 1996. During the call, Griffis stated that it was unfair for the Division to limit his contact with S.S.

Jacoby was similarly aware of S.S.'s peril. She documented her awareness of the anonymous call to McMullen that warned the Division about Griffis's presence. Further, she was aware of a telephone call from S.S's foster mother to the Division on June 20, 1995. The foster mother stated that, ". . . S. told her over and over that she humps with her daddy, Jon." Jacoby also knew that S.S. had exhibited inappropriate sexual behaviors on at least three occasions. Other telephone calls informed Jacoby

that S.S.'s father permitted Griffis to be in S.S.'s presence. Finally, Jacoby knew on December 19, 1995, that S.S. had a yeast infection and complained of "hurting in her vagina area."

Already having permitted S.S.'s father to have unsupervised visits with his daughter, McMullen, Jacoby, and Barnett permitted S.S. to live with her father on a full-time "extended visit" basis starting March 8, 1996. S.S. remained on this basis until McMullen -- just eight days after Griffis's phone call and three months after Dr. Sisk's report -- requested the Cass County Circuit Court to release S.S. from State custody and to return legal custody to the child's father. On August 22, 1996, the court granted McMullen's request, returned S.S. to her father, and released the child from the court's jurisdiction. McMullen's dictation of that day's events states that she and her supervisor (Barnett) decided "that if something happens to S. because he [the father] knows what Joell [sic] has done in the past that he will be solely responsible."

The next February, a call to a Jackson County child abuse hotline alleged that Griffis had sexually molested S.S. on November 15, 1996, and January 15, 1997. Both incidents occurred during times that S.S.'s father had allowed Griffis to live with him and S.S. Griffis was charged with two counts of first-degree statutory sodomy in Jackson County and two counts in Cass County. S.S.'s father was charged with four counts of felony child endangerment in Jackson County. As a result of the abuse that she suffered, S.S. was hospitalized for one week. She remained institutionalized at a Kansas City psychiatric facility when her guardian ad litem filed the instant complaint.

Relying upon DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989), the district court granted defendants' motion to dismiss the complaint. The court held that S.S. lacked a substantive due process right to be

protected from Griffis by the defendants, who are state employees.[2] This appeal followed. Because the defendants in this case did not merely "fail to protect" S.S. from Griffis, we reverse the judgment of the district court.

## I.

A complaint should be dismissed under Fed.R.Civ.P. 12(b)(6) only if, taking the allegations as true, "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). We review de novo the question of whether S.S.'s complaint states a viable claim. See Haberthur v. City of Raymore, 119 F.3d 720, 723 (8th Cir. 1997). We hold that it does.

## A.

Both plaintiff and defendants rely primarily upon DeShaney and its progeny in this and other circuits. This reliance is misplaced because it obscures the affirmative nature of the defendants' misconduct. Nevertheless, our inquiry must commence with DeShaney.

DeShaney's central holding is that state actors generally have no due process obligation to protect private parties from other private parties. 489 U.S. at 195-97. DeShaney involved the substantive due process claim of a boy (Joshua) who had been subjected to repeated beatings by his father. Id. at 192-93. When Joshua was treated at a hospital for bruises and abrasions, the Department of Social Services recommended

---

[2]The district court also dismissed S.S.'s procedural due process claim against the defendants. S.S. contended that Missouri statutory law sets out mandatory procedures that social workers and the Division must follow, giving rise to a liberty interest in personal safety. S.S. does not appeal this aspect of the district court's ruling.

that the boy be placed in the hospital's temporary custody.  Id. at 192.  Three days later, a "Child Protection Team" (consisting of Department caseworkers among others) determined that there was insufficient evidence of child abuse and that Joshua should be returned to his father's custody.  Id.  The DeShaney plaintiffs did not challenge or otherwise attack this determination.  Later, caseworkers from the Department continued to monitor the DeShaney home, observed numerous suspicious injuries, and were twice informed of such injuries by emergency room personnel, but took no action to protect Joshua from his father.  Id. at 192-93.  Eventually, Joshua was beaten so severely that he suffered severe brain damage and was rendered profoundly retarded.  Id. at 193. Joshua and his mother sued the defendants for failing to protect Joshua from his father, but the Court held that the defendants had no duty to protect the child under the Due Process Clause.  Id. at 195-97, 202.

Two related considerations distinguish the present case from DeShaney.  First, the DeShaney plaintiffs did not attack the state's decision to transfer custody back to Joshua's father after the child's temporary emergency custody in the hospital. DeShaney offers no suggestion that the transfer itself was unwise, much less unconstitutional, given the defendants' knowledge at the time of the transfer.[3]  Rather, the plaintiffs based their constitutional claim upon the state's conduct after the state had relinquished custody of the child.  DeShaney rejected this claim, for "while the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than

---

[3]Indeed, the DeShaney plaintiffs conceded that the State played no part in creating the danger that Joshua faced.  See id. at 197.  There is obviously no such concession in the present case.  See also DeShaney ex rel. First v. Winnebago County Dept. of Social Servs., 812 F.2d 298, 303 (7th Cir. 1987) ("There is no evidence that the Department was reckless in returning Joshua to the custody of his father back in January 1983.").

that in which he would have been had it not acted at all." <u>Id.</u> at 201. Because the above language may not describe <u>all</u> custody transfers, <u>DeShaney</u> did not categorically remove custody transfers from the set of cognizable due process claims. <u>See</u>, <u>e.g.</u>, <u>Camp v. Gregory</u>, 67 F.3d 1286, 1294 (7th Cir. 1995) (child placed in guardianship of state has due process right not to be placed with custodian whom state knows will fail to supervise child adequately), <u>cert. denied</u>, 517 U.S. 1244 (1996); <u>K.H. ex rel. Murphy v. Morgan</u>, 914 F.2d 846, 852 (7th Cir. 1990) (recognizing right of child in state custody not to be handed over to foster parent or other custodian whom state knows or suspects to be child abuser); <u>Ford v. Johnson</u>, 899 F. Supp. 227, 233 (W.D. Pa. 1995) (state actors may be liable for transfer of custody back to child's parent if defendants were at least "deliberately indifferent" to danger of abuse by parent), <u>aff'd without opinion</u>, 116 F.3d 467 (3d Cir. 1997). <u>DeShaney</u> does not foreclose the possibility that the present defendants -- unlike those in <u>DeShaney</u> -- did in fact create the danger that ultimately harmed S.S. or that they "render[ed] [her] more vulnerable to" that danger.

More generally, <u>DeShaney</u> limits the state's duty to protect its citizens from each other. It says little or nothing about the state's duty not to harm its citizens--the sort of violation alleged by S.S. Joshua's complaint based a substantive due process claim upon the defendants' "<u>failing to intervene to protect him</u> against a risk of violence at his father's hand of which they knew or should have known." <u>Id.</u> at 193 (emphasis added). As such, his claim failed, for "[t]he most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." <u>Id.</u> at 203. In stark contrast, S.S. does not merely allege that the state failed to protect her from Griffis; rather, the defendants affirmatively placed S.S. in Griffis's path despite their knowledge of the threat he posed.

**B.**

Notwithstanding the general rule that the government has no duty to protect its citizens, DeShaney and its progeny have set out two exceptions:  the "special relationship" theory and the "state-created danger" theory.  Under the former, the state has a duty to protect an individual under its care, custody, or control when the state has removed one's ability to care for oneself.  See DeShaney, 489 U.S. at 199-201 (although state may bear affirmative duties when it "takes a person into its custody and holds him there against his will," Joshua's injury occurred while in his father's custody; state actors not liable for failing to protect Joshua, despite having earlier taken temporary custody of him); Norfleet ex rel. Norfleet v. Arkansas Dept. of Human Servs., 989 F.2d 289, 293 (8th Cir. 1993) (prison not sole setting in which state must safeguard an individual's civil rights); Dorothy J. v. Little Rock School Dist., 7 F.3d 729, 732 (8th Cir. 1993) (restrictive custodial relationship may create state's duty to protect individual from private harm, but state-mandated school attendance held insufficiently restrictive to do so).  Under the "state-created danger" theory of liability, a duty to protect emerges after the state affirmatively places an individual in a position of danger that the individual would not otherwise have faced.  See, e.g., Greer v. Shoop, 141 F.3d 824, 827-28 (8th Cir. 1998); Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc), cert. denied, 507 U.S. 913 (1993); Wells v. Walker, 852 F.2d 368, 369-70 (8th Cir. 1988), cert. denied, 489 U.S. 1012 (1989).

For the same reason that DeShaney does not control the present case, its two exceptions are also of limited relevance. Eighth Circuit precedent has consistently read the two DeShaney exceptions as just that, i.e., as exceptions to the rule that the government has no duty to protect private individuals from other private individuals. In this circuit, the "special relationship" and "state-created danger" theories define the state's affirmative duty to protect people, not its more basic duty to refrain from endangering them. Significantly, in a number of decisions (one before and several after DeShaney) we have recognized the state's "duty to protect" when it affirmatively

places an individual in a position of danger that he or she would not otherwise have been in, or when it assumes a custodial or other "special" relationship with an individual. <u>See</u> <u>Wells</u>, 852 F.2d at 370 ("Circuit court decisions examining whether a particular individual . . . <u>is entitled to protection by the state from third-party harm</u> generally recognize that the due process clause may be implicated in the following situations: First, when a 'special custodial or other relationship created or assumed by the state' exists . . . or second, when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have been in.") (emphasis added); <u>Gregory</u>, 974 F.2d at 1010 ("We have held that the Due Process Clause imposes a <u>duty on state actors to protect or care for citizens</u> in two situations: first, in custodial and other settings in which the state has limited the individuals' ability to care for themselves; and second, when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced.") (emphasis added); <u>Carlton v. Cleburne County</u>, 93 F.3d 505, 508 (8th Cir. 1996) (same); <u>Davis v. Fulton County</u>, 90 F.3d 1346, 1350-51 (8th Cir. 1996) ("As a general rule, the Fourteenth Amendment does not impose any duty on states to <u>protect its (sic) citizens against violence inflicted by private actors</u> . . . . <u>DeShaney</u> recognizes an exception to this rule, however. A duty to protect an individual exists where she is in a special custodial or other setting in which the state has limited her ability to care for herself . . . . A <u>duty to protect</u> has also been recognized in the circuit courts when the state affirmatively places a particular individual in a position of danger that she would not otherwise have faced.") (emphasis added) (internal citations omitted).

## 1.

To the extent that S.S. predicates her lawsuit upon the defendants' "failure to protect" her from Griffis, her claims meet with only limited success. First, S.S.'s reliance upon the "special relationship" theory is unavailing. Although the state has a constitutional obligation to protect certain individuals under its care, that duty cannot extend beyond the existence of the "special relationship" in question. Because the

"special relationship" itself creates the state's duty to protect, the duty cannot outlive the relationship. Thus, custody is generally a prerequisite to any "special relationship"/duty to protect claim. See, e.g., DeShaney, 489 U.S. at 201 (no "special relationship" because child's injuries occurred while he was in father's custody rather than state's); Norfleet, 989 F.2d at 293 (state's obligation to provide medical care to asthmatic child arose because of "special custodial relationship" that state assumed when it placed child in state-run foster care setting). S.S.'s claim fails because Griffis sodomized her almost three months after the state relinquished custody of her. S.S. attempts to distinguish DeShaney by contrasting her two and one-half year period of state custody with the three-day temporary custody that the state had over Joshua DeShaney. See DeShaney, 489 U.S. at 201. This distinction is not relevant to the "special relationship" theory. The state's lengthy custodial relationship with S.S. may indeed bear upon whether the defendants acted recklessly or whether their actions "shock the judicial conscience" -- see Part II B, infra -- but it cannot extend the state's "duty to protect" beyond the relationship that created that duty.

## 2.

By contrast, S.S.'s complaint threads an elusive needle and states a viable claim under the "state-created danger" theory, which recognizes the obligation of state actors to subsequently protect an individual after they have created a danger to the individual's well-being. See, e.g., Davis v. Fulton County, 90 F.3d 1346, 1350-51 (8th Cir. 1996). Such liability is entirely distinct from whatever liability may attach for the creation of the relevant danger in the first place. See Part II, infra. Thus, defendants may be liable both for creating the danger that Griffis would sexually abuse S.S. and for failing to protect S.S. once they created that danger. At this early stage, we cannot determine the extent of defendants' liability under a "state-created danger" theory. Further proceedings might establish, for example, the particular protective measures that defendants might have undertaken once S.S.'s father took custody of S.S. Thus, because it is far from "clear that no relief could be granted under any set of facts that

-10-

could be proved consistent with the allegations," <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984), we conclude that S.S. has stated a viable claim under the "state-created danger" theory.[4]

----

[4]Appellees argue that the "state-created danger" theory does not apply because they neither created the danger faced by S.S. nor placed her in a worse position than if they had not assigned custody to her father. Specifically, they contend, S.S. was never sexually abused while in state custody even though she was on numerous occasions entrusted to her father's unsupervised care and subjected to Griffis's presence. Because Griffis had contact with S.S. both before and after the child's release from state custody, the change in custody "did not trigger any greater or new danger than existed prior to her release." Appellees' Br. at 15.

We are not persuaded. First, we conclude that the complaint did in fact allege that S.S. was abused by Griffis prior to the transfer of custody. The child abuse hotline call to McMullen, for instance, stated that "S. had a rash 'down there," and that "there is also a man who hangs around the household that S.S. calls grandpa and that he used to be a child molester." McMullen acted upon the phone call by visually examining S.S.'s genital area. These allegations suggest not only that McMullen suspected that Griffis was sexually abusing the child, but also that Griffis had in fact done so. Second, the complaint, liberally construed, suggests that S.S.'s release from state custody may have facilitated Griffis's sexual abuse of her. Indeed, the defendants documented their concerns about S.S. when they warned her father during the custody transfer that he would be "solely responsible" for any harm that Griffis might bring. Dismissal is appropriate only if it appears beyond a reasonable doubt that S.S. can prove no set of facts which would entitle her to relief. <u>See</u> <u>Whisman v. Rhinehart</u>, 119 F.3d 1303, 1308 (8th Cir. 1997). We therefore must reject the appellees' argument that they did not create or enhance the danger that Griffis posed.

-11-

## II.

### A.

This case primarily concerns S.S.'s right not to be injured by the state -- essentially a "negative liberty" -- a right which both pre-dates DeShaney and is broader than S.S.'s right to be protected by the state, the "positive" liberty that DeShaney limited.  See K.H. ex rel. Murphy v. Morgan, 914 F.2d 846, 848-49 (7th Cir. 1990):

> This is not a "positive liberties" case, like DeShaney, where the question was whether the Constitution entitles a child to governmental protection against physical abuse by his parents or by other private persons not acting under the direction of the state.  The Supreme Court agreed with this court that there is no such entitlement.  Here, in contrast, the state removed a child from the custody of her parents; and having done so, it could no more place her in a position of danger, deliberately and without justification, without thereby violating her rights under the due process clause of the Fourteenth Amendment than it could deliberately and without justification place a criminal defendant in a jail or prison in which his health or safety would be endangered, without violating his rights . . . under the cruel and unusual punishments clause . . . if he was a convicted prisoner, or the due process clause if he was awaiting trial.

(citations omitted).  One may have a right not to be harmed by the state, a negative liberty, in circumstances that present no right to the state's protection from one's fellow citizens, a positive liberty.  See Pinder v. Johnson, 54 F.3d 1169, 1177 (4th Cir.) (en banc) ("When the state itself creates the dangerous situation that resulted in a victim's injury, . . . [t]he state is not merely accused of a failure to act; it becomes much more akin to an actor itself directly causing harm to the injured party." ), cert. denied, 516 U.S. 994 (1995);  Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982) ("There is a constitutional right not to be murdered by a state officer, . . . [b]ut there is no constitutional right to be protected by the state against being murdered by criminals or

madmen.").[5]  For example, although "the State does not become the permanent guarantor of an individual's safety by having once offered him shelter," DeShaney, 489 U.S. at 201, state actors who rescue children then injure them may not defend on the ground that they had no duty to rescue the children in the first place.  "The state, having saved a man from a lynch mob, cannot then lynch him, on the ground that he will be no worse off than if he had not been saved . . . .  [T]he absence of a duty to rescue does not entitle a rescuer to harm the person whom he has rescued."  K.H., 914 F.2d at 849.  See also Pinder 54 F.3d at 1176 n.* ("creation" of danger implicates alternative section 1983 liability framework rather than either of DeShaney's two exceptions, but courts should proceed with caution);[6] Wood v. Ostrander, 879 F.2d 583, 591-95 (9th Cir. 1989) (denying qualified immunity defense to substantive due process claim, where woman was raped after officer impounded her car and left her alone in known high-crime area), cert. denied, 498 U.S. 938 (1990).

Therefore, even though children have no substantive due process right to be protected from abusive parents, the state may not itself subject children to abuse by knowingly delivering them into the hands of abusive caregivers.  See, e.g., Camp v. Gregory, 67 F.3d 1286, 1294 (7th Cir. 1995) (child placed in guardianship of state has

[5]If the Due Process Clause prohibits a state actor from "intentionally harming an individual physically without justification," then "[t]he extension [of this principle] to the case in which the plaintiff's mental health is seriously impaired by deliberate and unjustified action is . . . straight-forward."  See Camp v. Gregory, 67 F.3d 1286, 1293 (7th Cir. 1995) (quoting K.H., 914 F.2d at 848).

[6]Pinder would limit liability for the state's "affirmative acts" to cases in which the state actor directly injures the plaintiff, rather than cases in which the state's acts permit a third party to harm the plaintiff.  See 54 F.3d at 1176 n.*.  Rather than erecting a bright-line rule, we think the better approach to cases such as the one before us is to ask whether the state actor proximately caused the plaintiff's injury notwithstanding the third party's position in the causal chain.   Indeed, both Martinez v. California, 444 U.S. 277, 285 (1980) and Doe v. Wright, 82 F.3d 265, 268 (8th Cir. 1996), suggest how courts might approach the question of proximate cause in such section 1983 cases.

due process right not to be placed with custodian whom state knows will fail to supervise child adequately, where child was later killed after becoming involved in gang activity); K.H., 914 F.2d at 852 (recognizing right of child in state custody not to be handed over to foster parent or other custodian whom state knows or suspects to be child abuser)[7]; Ford v. Johnson, 899 F. Supp. 227, 233 (W.D. Pa. 1995) (state actors may be liable for transfer of custody back to child's parent if defendants were at least "deliberately indifferent" to danger of abuse by parent), aff'd without opinion, 116 F.3d 467 (3d Cir. 1997).

The defendants in this case did not merely fail to protect S.S. from Griffis. Rather, they affirmatively placed S.S. into Griffis's path. McMullen, Jacoby and Barnett were fully aware of the risks to which they were subjecting S.S. but apparently decided that those risks were the sole responsibility of S.S.'s father. To be sure, it is not always easy to distinguish cases in which the state has merely failed to protect its citizens from those in which it has affirmatively injured them. We are mindful of "the

---

[7]Although K.H. recognizes a right of children in state custody not to be handed over to abusive caregivers, Judge Posner's opinion exempts state actors from liability in cases where children are delivered back to their own parents. See 914 F.2d at 852-53. Like other courts that have considered K.H.'s distinction between placement with a parent and placement with someone else, we find the distinction unpersuasive. See Ford v. Johnson, 899 F. Supp. 227, 233 (W.D. Pa. 1995) ("The fact that the child is placed with a parent as opposed to a foster parent should not change the standards by which social agencies and their employees conduct their investigations. It is important to remember that in the case at bar, Shawntee had not been in the custody of her father, but, rather, had been in the custody of CYS and was placed with her father by the court after a CYS investigation and recommendation."), aff'd without opinion, 116 F.3d 467 (3d Cir. 1997); Currier v. Doran, 23 F. Supp.2d 1277, 1281 n.3 (D.N.M. 1998). For that matter, as Currier points out, Judge Posner himself appears to have since disavowed his position. In dictum, he stated that DeShaney would not bar liability if state actors were to place a child in a dangerous position by taking her to her father's house in violation of a court order. See Bank of Illinois v. Over, 65 F.3d 76, 78 (7th Cir. 1995).

tenuous metaphysical construct which differentiates sins of omission and commission," see White v. Rochford, 592 F.2d 381, 384 (7th Cir. 1979), but DeShaney itself compels us to distinguish the state's affirmative misdeeds from its unfortunate omissions, to differentiate misfeasance from nonfeasance: "The [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." 489 U.S. at 195. The defendants in this case have transgressed the limitations -- not the obligations -- that the Due Process Clause imposes on state actors. They are a "doer of harm rather than merely an inept rescuer, just as the Roman state was a doer of harm when it threw Christians to the lions." K.H., 914 F.2d at 849.

**B.**

Having concluded that DeShaney does not defeat S.S.'s claim, our analysis is not complete. Whether seeking to recover for the defendants' affirmative misdeeds (the transfer of custody to S.S.'s father) or for their failure to protect her after those misdeeds (the "state-created danger" theory), S.S. must still establish the elements that govern any substantive due process claim brought under section 1983. First, the defendants must have acted with the requisite degree of culpability. See Daniels v. Williams, 474 U.S. 327, 330-31 (1986) (negligence insufficient, but leaving open recklessness or gross negligence); County of Sacramento v. Lewis, ___ U.S. ___, 118 S. Ct. 1708, 1718 (1998) (leaving open recklessness or gross negligence); Sellers ex rel. Sellers v. Baer, 28 F.3d 895, 902-03 (8th Cir. 1994) (gross negligence insufficient), cert. denied, 513 U.S. 1084 (1995); Gregory v. City of Rogers, 974 F.2d 1006, 1012 (8th Cir. 1992) (en banc) (reserving question of minimum level of culpability), cert. denied, 507 U.S. 913 (1993).[8] Second, because she challenges official actions rather

---

[8]"Deliberate indifference" does not meaningfully differ from willful recklessness, i.e., wherein the actor responds unreasonably to a substantial and known risk rather than to a risk of which the actor merely should have known. See Farmer v. Brennan, 511 U.S. 825, 836-39 (1994) (equating "deliberate indifference" with subjective or criminal recklessness). By contrast, so-called "civil recklessness" or "gross

than a legislative pronouncement, S.S. must establish that the defendants' conduct shocks the conscience. See Lewis, 118 S. Ct. at 1717 and n.8; id. at 1724 (Scalia, J., concurring). Third, she must prove that the defendants proximately caused her injuries. See Brower v. County of Inyo, 489 U.S. 593, 599 (1989); see also Martinez v. California, 444 U.S. 277, 285 (1980); Doe v. Wright, 82 F.3d 265, 268 (8th Cir. 1996).

Unlike negligence, "deliberate indifference" requires one's knowledge that a substantial risk of serious harm accompanies one's course of action. See Farmer v. Brennan, 511 U.S. 825, 837 (1994) (prison official must know of and disregard excessive risk to inmate's health or safety); Davis v. Monroe County Bd. of Educ., ___ U.S. ___, 119 S. Ct. 1661, 1674 (1999) (school officials are "deliberately indifferent" to student-on-student sexual harassment only when their response to it "is clearly unreasonable in light of the known circumstances") (emphasis added). S.S's complaint alleges that the defendants' actions evince a "deliberate and conscious indifference to the Plaintiff's safety and well-being and violate S.S.'s constitutional right to be reasonably safe from harm." J. App. 6, 8, 11. The alleged facts amply support this charge. McMullen knew that S.S.'s father had subjected his daughter to a known sex offender (evidenced by the anonymous telephone call she received, Dr. Sisk's psychiatric evaluation, the anonymous child abuse hotline call of July 1996, and Griffis's own complaints that his access to S.S. had been unfairly limited), while Jacoby documented her awareness of S.S.'s inappropriate sexual behaviors, S.S.'s complaints of pain in her genital area, various telephone calls to the Division that warned of Griffis's presence, and sexual abuse by S.S.'s father. Finally, McMullen herself wrote that she and her supervisor decided "that if something happens to S.

---

negligence" may exist when the risk of harm is so obvious that the actor should have known about it even if he or she did not actually know about it. Id. at 836 and n.4.

because he [the father] knows what Joell [sic] has done in the past that he will be solely responsible."[9]

Whether the defendants' deliberate indifference shocks the conscience presents a separate but related question. Lewis explored the continuum of "deliberately indifferent" conduct and held that "deliberate indifference that shocks [the conscience] in one environment may not be so patently egregious in another." 118 S. Ct. at 1718.[10] Substantive due process therefore demands "an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking." Id. at 1718-19. Lewis placed particular importance upon the state defendant's ability to actually deliberate upon his conduct before undertaking it. Id. at 1719. Therefore, the reckless police pursuit of a fleeing motorist in Lewis did not "shock the conscience" when injuries were caused thereby, id. at 1720, nor does a jailer's deliberately indifferent response to a prison riot establish an Eighth Amendment claim. Id. Prison officials' "deliberate indifference" toward a pretrial detainee's medical needs, on the other hand, can indeed implicate substantive due process.
Id. at 1718-20. Such liability "rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." Id. at 1720.

---

[9]The dissent argues that the defendants' actions amount to nothing more than gross negligence. To the contrary, the social workers knew the precise danger that faced S.S. if custody were returned to her father. Not only were they "aware of facts from which the inference could be drawn that a substantial risk of harm exists," but they also drew the inference itself. See Farmer, 511 U.S. at 837.

[10]Lewis was decided two days before the defendants' brief was filed and seventeen days before the reply brief was filed. Although the case is not discussed in the parties' briefs and although no Fed. R. App. P. 28J letter has been filed with the court, Lewis points to the analysis that is required to assess S.S.'s substantive due process claim.

We conclude that the defendants' conduct resembles the actionable deliberate indifference of prison officials more closely than the non-actionable recklessness of police officers who pursue fleeing suspects at high speeds through crowded cities. Unlike the police officers in Lewis, the defendants faced no split-second decision in determining S.S.'s custody. To the contrary, S.S.'s complaint recounts the defendants' reflections upon the risk to which they willfully subjected S.S. The allegations paint a picture that shocks the conscience of the court sufficiently to survive a motion to dismiss. First, Defendants caused injury to a well-recognized right of S.S.: her bodily integrity. See Albright v. Oliver, 510 U.S. 266, 272 (1994) (bodily integrity is among the fundamental rights implicated by substantive due process); Lewis, 118 S. Ct. at 1717 n.8 (whether conduct is conscience-shocking "may be informed by a history of liberty protection. . ."); id. at 1722 (Kennedy, J., concurring) ("History and tradition are the starting point. . .of the substantive due process inquiry."). Second, despite their obligations to safeguard S.S.'s best interests,[11] the defendants knowingly exposed her to a risk of sexual abuse and determined that S.S.'s father (not themselves) would be "solely responsible" if the child fell victim to Griffis's predations. Under these circumstances, we cannot conclude that "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984), and we therefore reverse the dismissal of S.S.'s complaint.

Appellees have raised no issue of whether the defendants proximately caused S.S.'s injuries. Likewise, we need not consider whether the appellees might be shielded from liability by absolute or qualified immunity--a question briefed by the parties below but left unresolved by the district court.

---

[11]See Mo. Rev. Stat. § 211.011 (1995) ("The child welfare policy of this state is what is in the best interest of the child.").

**III**.

For the foregoing reasons, the judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting.

As the court notes, the decisions of the United States Supreme Court, and our own cases as well, erect numerous hurdles to a recovery by S.S. against these defendants. I pass over the difficulty of comprehending exactly what *DeShaney* requires when it speaks of distinguishing between acting and not acting, because I do not think that the complaint in this case lays out a case for anything more than gross negligence on the defendants' part. The court, moreover, does not explain why the defendants' deliberate indifference would render them liable, or, indeed, what the difference between gross negligence and deliberate indifference might be. Finally, although what the defendants are said to have done here may be grossly negligent, I cannot say that their acts shock the conscience in the constitutional sense. At most, the defendants exposed S.S. to a risk of personal and physical harm. If this is enough to make out a due process claim, then I cannot see how any complaint that alleges facts amounting to gross negligence or recklessness can ever fail to survive a motion to dismiss.

I therefore respectfully dissent from the court's holding in this case.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.