24-1997-cv
*J.M. v. Sessions*

# In the
# United States Court of Appeals
# for the Second Circuit

————————

August Term 2025
Argued: October 3, 2025
Decided: December 23, 2025

No. 24-1997-cv

————————————

J.M., AS ADMINISTRATOR OF THE ESTATE OF HER SON, C.B.,
*Plaintiff-Appellant*,

v.

ASHLEY SESSIONS, ELISE M. WILLIAMS, COREY C. BEHLEN, RAYMOND J. MCGINN,
KATHERINA L. CASSATA, MICHAEL NOVACK,
*Defendants-Appellees*,[*]

DOES 1-6,
*Defendants*.

————————————

Appeal from the United States District Court
for the Northern District of New York
No. 1:20-cv-91, Glenn T. Suddaby, *Judge*.

————————————

Before: PARKER, CARNEY, and KAHN, *Circuit Judges*.

————————————

Plaintiff-Appellant J.M. commenced this action on behalf of her son, C.B., who died while residing at a facility operated by the New York State Office for People with

————————————

[*] The Clerk of Court is respectfully directed to amend the case caption as indicated above.

Developmental Disabilities. Plaintiff alleged that Defendants-Appellees—C.B.'s caretakers—ignored C.B.'s pleas for help and obvious signs of heart failure, resulting in his death. Plaintiff asserted a cause of action under 42 U.S.C. § 1983 for violations of C.B.'s substantive due process rights and brought state law claims for negligence and medical malpractice. The United States District Court for the Northern District of New York (Suddaby, *J.*) granted Defendants-Appellees' motion for summary judgment on Plaintiff's § 1983 claim and declined to exercise supplemental jurisdiction over Plaintiff's state law claims. Plaintiff timely appealed.

We conclude that the district court erred in determining that C.B. had no substantive due process right to adequate medical care because he voluntarily admitted himself to the state-run facility. Under our decision in *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239 (2d Cir. 1984), C.B. was entitled to adequate medical care pursuant to the substantive guarantees of the Due Process Clause regardless of whether he was admitted to the facility by a court order or voluntarily. Pursuant to *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), these rights arise when, as here, the state exercises sufficient control over a voluntarily committed resident's life and such control renders that individual incapable of helping themselves. Therefore, we **VACATE** the order and judgment of the district court and **REMAND** the matter for further proceedings in conformity with this opinion.

————————

SAMUEL SHAPIRO (Ilann Margalit Maazel, Laura Kokotailo, *on the brief*), Emery Celli Brinckerhoff Abady Ward & Maazel, LLP, New York, NY, *for Plaintiff-Appellant*.

DOUGLAS E. WAGNER, Assistant Solicitor General (Jeffrey W. Lang, Deputy Solicitor General, Barbara D. Underwood, Solicitor General, *on the brief*), *for* Letitia James, Attorney General of the State of New York, Albany, NY, *for Defendants-Appellees Elise M. Williams, Corey C. Behlen, Raymond J. McGinn, Katherina L. Cassata, Michael Novack*.

BENJAMIN W. HILL, (Alexandra N. Von Stackelberg, *on the brief*), Capezza Hill, LLP, Albany, NY, *for Defendant-Appellee Ashley Sessions*.

————————

2

Maria Araújo Kahn, *Circuit Judge*:

Plaintiff-Appellant J.M. commenced this action on behalf of her son, C.B., who died at the age of 34 while residing at the Valley Ridge Center for Intensive Treatment, a facility operated by the New York State Office for People with Developmental Disabilities ("OPWDD"). J.M. alleges that Defendants-Appellees—C.B.'s caretakers at Valley Ridge—ignored C.B.'s pleas for help and obvious signs of heart failure, resulting in his death. She brought a constitutional claim under 42 U.S.C. § 1983 for violations of C.B.'s substantive due process rights and state law claims for negligence and medical malpractice. The district court granted Defendants' motion for summary judgment in full. The principal issue on appeal is whether C.B., a voluntarily admitted resident at a state-run mental health facility, may bring a substantive due process claim against the state for its failure to provide adequate medical care. We hold that he may. Accordingly, the order and judgment of the district court are **VACATED** and the matter is **REMANDED** to the district court for further proceedings in conformity with this opinion.

## BACKGROUND

### I. FACTS

The following facts are taken from the summary judgment record, which are undisputed unless otherwise noted. Because this appeal arises from a grant of summary

3

judgment, we view the evidence in the light most favorable to J.M. as the non-moving party and draw all reasonable inferences in her favor. *See Reese v. Triborough Bridge & Tunnel Auth.*, 91 F.4th 582, 589 (2d Cir. 2024).

On the morning of April 9, 2018, C.B. was found unresponsive in his bedroom at Valley Ridge. He was declared dead shortly after EMS arrived. His autopsy revealed that he likely died of cardiomyopathy, a heart condition. J.M. alleges that Defendants—current and former Valley Ridge employees—by ignoring signs of C.B.'s worsening medical condition, caused C.B.'s death.

## A. C.B.'s Voluntary Admission to Valley Ridge

C.B. was born in 1983. He suffered from autism, mood disorder NOS (not otherwise specified), impulse control disorder, mild mental retardation, and antisocial personality disorder, and he had a history of closed head injury. During his childhood, C.B. lived at home with his mother, J.M. However, around the time he turned 18, J.M. determined that C.B. "couldn't be home," and placed him in the care of the New York State OPWDD. App'x 2246.

In 2015, C.B. applied for and was granted voluntary admission to the Valley Ridge Center for Intensive Treatment in Norwich, New York ("Valley Ridge"). Valley Ridge is a secure facility—enclosed by tall perimeter fencing—that houses residents who are voluntarily admitted, like C.B., and residents who are involuntarily admitted by court

4

order.  Regardless of their admission status, Valley Ridge treats all residents the same. Residents are not free to leave as they please and are always under staff supervision.

Valley Ridge apprised C.B. of these restrictions when he arrived in May 2015. Upon admission, Valley Ridge provided C.B. with—and he signed—a "Notice of Status and Rights," which explained that he would "live, sleep, work and play [at Valley Ridge] unless [he was] allowed to go somewhere else."  App'x 2238.  It further informed C.B. that he would not be free to leave, providing:

> At any time, you may tell the director or other staff members that you want to leave.  However, you may not leave for three days unless the director lets you.  If the director thinks you need to stay, he may ask a court for an order to keep you here.

*Id.*

C.B.'s access to medical care at Valley Ridge was also highly restricted.  He could not see a doctor or go to the hospital without permission.  Nor could he contact 911 to seek emergency medical services.  If he dialed 911, his call would be routed to Valley Ridge's safety department.  He was dependent on Valley Ridge's on-site providers to receive medical care.

Defendants in this action are current and former Valley Ridge staff members who were responsible for caring for C.B.  The Valley Ridge staff included direct care staff, who supervised the housing unit where C.B. lived, and medical staff.  The medical staff included one nurse practitioner, Defendant Raymond McGinn, and several registered nurses, including Defendant Elise Williams, and proposed defendant Anita Baral.  The

5

direct care staff included: Defendant Michael Novack, the supervisor of the unit where C.B. lived; Defendant Katherina Cassata, a staff member on duty in the days before C.B.'s death; Defendant Corey Behlen, the head of the night shift on April 8-9, 2018; and Defendant Ashley Sessions, a trainee who worked the night shift on April 8-9, 2018.

## B. C.B.'s Medical Condition and Death

In the months leading up to C.B.'s death, his health began to deteriorate substantially. In 2017, he was diagnosed with hypertension. In the early months of 2018, he began gaining weight rapidly, putting on at least 13 pounds between December 2017 and April 2018, despite being placed on a calorie-controlled diet and engaging in regular exercise.[1] In the weeks before his death, C.B.'s breathing was erratic, he "was always complaining of heart burn," he grew lethargic during the day, and he complained of nocturia (needing to urinate frequently at night). App'x 964. As C.B.'s medical providers later acknowledged, these are all well-known symptoms of heart failure.

C.B.'s symptoms grew more severe in his final days. On April 4, he reported to Defendant Cassata that "he couldn't breathe, that his chest hurt" and that "[h]e was tired all the time." App'x 925. By April 6, he was unable to complete basic tasks. Cassata testified that C.B. "looked physically sick": "He had no color. He was sweating. He was clammy to the touch. He was out of breath . . . . [H]e was sitting down in the chair trying

---

[1] The extent of C.B.'s weight gain is disputed. C.B.'s weight chart indicates that he gained either 13 or 21 pounds during this four-month period.

to vacuum sitting down . . . scooching himself along." App'x 929. This was a "dramatic change" from C.B.'s ordinary behavior. *Id*. On this occasion, Cassata testified that she notified the nurse on duty, Anita Baral, who "looked at him, told him to have some water" and to "go lay down." App'x 1978.[2]

On the morning before he died, C.B.'s symptoms became even more severe. He called his mother, J.M., and told her he was having problems breathing and could not urinate and abruptly hung up on her, which was highly unusual. Sensing an emergency, J.M. called Defendant Novack and reported C.B.'s symptoms. C.B. then told Novack that he was struggling to breathe and asked to go to the hospital. Novack did not document either interaction; the parties dispute whether he notified nursing of C.B.'s symptoms. C.B. was not taken to a hospital.

Later that afternoon, Defendant Williams saw C.B. at Valley Ridge's clinic. When C.B. arrived, Willliams observed that he was having difficulty breathing. C.B. also complained of difficulty urinating. Williams took C.B.'s vital signs, which were within normal limits, listened to his lungs, which appeared clear, and examined his bladder. Williams did not check C.B.'s respiratory rate, listen to his heart, or perform an EKG. She believed his symptoms were caused by sinus congestion, told him to take cough syrup,

---

[2] Cassata also testified that she documented C.B.'s condition, but those notes are missing from the record. She further testified that she was instructed to take C.B.'s vitals on both days, which were within normal limits, and which she recorded on a trifold paper towel.

and encouraged him to drink water and stay hydrated. However, as Plaintiff's expert notes, given C.B.'s "underlying cardiomyopathy," "aggressively hydrat[ing] . . . was the worst thing [he] could do," as it would cause his "diseased heart" to "go into pulmonary edema." App'x 2301. With that, Williams sent C.B. back to his housing unit. The visit lasted less than 15 minutes, and Williams did not follow up on his condition thereafter.

That night, Defendant Sessions was assigned to C.B.'s housing unit and was responsible for performing bed checks every two hours: at 11pm, 1am, 3am, and 5am. Sessions failed to check on C.B. at 3am and 5am and instead falsified records to reflect that she had performed the required checks (a lie she subsequently repeated to the New York State police). Instead of performing the checks, Sessions watched movies. Her supervisor, Defendant Behlen, was also present that night. He noticed Sessions on the computer but failed to ensure that she had completed the required bed checks. He was watching TV in the unit's living room.

C.B. died alone in his bed sometime between four and six in the morning. Plaintiff's expert opined that shortly before his death, C.B. would have awoken due to his "abrupt development of pulmonary edema and [would have] experienced the sensation of drowning." App'x 1170. He was discovered unresponsive at 6:30am, cold to the touch and with blue lips.

8

## II. PROCEDURAL HISTORY

Plaintiff brought this action in the U.S. District Court for the Northern District of New York, asserting a claim under 42 U.S.C. § 1983 that Defendants violated C.B.'s substantive due process rights under the Fourteenth Amendment, as well as medical malpractice and negligence claims under state law.

Just prior to the close of discovery, and sixteen months after the district court's deadline to amend the pleadings, Plaintiff moved to amend her complaint to add claims against a new defendant, Anita Baral, a nurse who treated C.B. during the time period leading up to his death. Magistrate Judge Hummel denied the motion, ruling that Plaintiff had failed to establish "good cause" under Rule 16(b). The court found that Plaintiff had not been diligent in adding Baral because Defendants had turned over an investigative report fourteen months earlier which reflected Baral's treatment of C.B. The court further found that adding Baral at the eleventh hour would prejudice Defendants. The district court affirmed Magistrate Judge Hummel's order.

At the close of discovery, Defendants moved for summary judgment, which the district court granted on July 11, 2024. The court found that C.B. could not bring a substantive due process claim because he was voluntarily admitted to Valley Ridge and, as such, found that the state did not affirmatively deprive him of liberty so as to trigger a constitutional duty of care. Having granted summary judgment on Plaintiff's sole federal

9

claim, the court declined to exercise supplemental jurisdiction over the remaining state law claims.

## DISCUSSION

We review the district court's grant of summary judgment *de novo*, construing the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in their favor. *Kowalchuck v. Metro. Transp. Auth.*, 94 F.4th 210, 214 (2d Cir. 2024).

The district court's disposition of Plaintiff's suit turned on the single issue of whether C.B., as a voluntarily admitted resident at Valley Ridge, had a substantive due process right to adequate medical care. We address this constitutional question before turning to Defendants' qualified immunity defense and the denial of Plaintiff's request to amend her complaint.

## I. FOURTEENTH AMENDMENT CLAIM

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." In *Youngberg v. Romeo*, the Supreme Court applied this Clause to protect the right of involuntarily committed patients to "conditions of reasonable care and safety" including the right to "adequate food, shelter, clothing, and medical care." 457 U.S. 307, 324 (1982); *see also Collins v. City of Harker Heights*, 503 U.S. 115, 127–28 (1992) ("The 'process' that the Constitution guarantees in connection with any deprivation of liberty thus includes a

10

continuing obligation to satisfy certain minimal custodial standards.").  This is, in part,

because when a "person is institutionalized," they become "wholly dependent on the

[s]tate."  *Youngberg*, 457 U.S. at 317.  That total dependency confers on the state an

affirmative "duty to provide certain services and care."  *Id.*

Shortly after *Youngberg*, we extended these rights to "anyone in a state institution"

regardless of how they came to be institutionalized.  *Soc'y for Good Will to Retarded*

*Children, Inc. v. Cuomo*, 737 F.2d 1239, 1246 (2d Cir. 1984).  In *Society for Good Will*, thirteen

residents at "a state[-]operated school for [individuals with developmental disabilities]"

alleged that the facility violated their substantive due process rights as recognized in

*Youngberg*.  *Id.* at 1242.  The state argued that these rights did not apply because the

residents "were not admitted to the Center with a court order[,]" *i.e.*, they were "not

classified as 'involuntary.'"  *Id.* at 1245.  We found this distinction to be "irrelevant," and,

echoing *Youngberg*, we held that once a person is in the state's custody and "dependent

on the state" for their essential needs, the state acquires a duty to provide for those needs

"in a manner that [does] not deprive [that person] of constitutional rights."  *Id.* at 1246.

These rights, however, do not extend to the public at large.  Several years after

*Society for Good Will*, in *DeShaney v. Winnebago County Department of Social Services*, the

Supreme Court rejected the idea that the Due Process Clause imposes an affirmative duty

on the government generally to guarantee citizens "certain minimal levels of safety and

security."  489 U.S. 189, 195 (1989).  There, a toddler, Joshua DeShaney, resided with his

11

father, who severely beat him. *Id.* at 192. Over the course of roughly two years, Joshua's family and doctors repeatedly reported the father's abuse, but county social workers failed to meaningfully intervene. *Id.* at 192–93. Eventually, Joshua's father beat him so badly that he suffered severe brain damage and was expected to be "confined to an institution" for the rest of his life. *Id.* at 193. Joshua's representative sued Winnebago County, alleging that the social workers violated his substantive due process rights by failing "to protect him against a risk of violence at his father's hands." *Id.* The Court rejected Joshua's claim, finding that the "State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. The Court reasoned that the Clause is a "limitation on the State's power to act," not an "affirmative obligation on the State to ensure" life, liberty, and property. *Id.* at 195. The Clause's "purpose was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196.

In *DeShaney*, however, the Court expressly noted that the state *does* acquire affirmative duties to those it involuntarily confines. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199–200 (citing *Youngberg*, 457 U.S. at 317). This is because "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human

12

needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *Id.* at 200. Thus, when the state curtails liberty "through incarceration, *institutionalization, or other similar restraint of personal liberty*" it "trigger[s] the protections of the Due Process Clause." *Id.* (emphasis added).

Since *DeShaney*, we have referred to this as the "special relationship" exception to the general rule that the Due Process Clause confers no affirmative rights. *See Lombardi v. Whitman*, 485 F.3d 73, 79 n.3 (2d Cir. 2007) (providing that the "special relationship" exception "arise[s] ordinarily if a government actor has assumed an obligation to protect an individual by restricting the individual's freedom in some manner, as by imprisonment"). We have typically "focused on involuntary custody" as the "linchpin" of the special relationship exception analysis. *See Matican v. City of New York*, 524 F.3d 151, 156 (2d Cir. 2008) (finding no special relationship between a confidential informant and a police department because the informant "was not in custody at the time" and the state "did not render[] him unable to care for himself" (internal quotation marks omitted)). *But see Charles v. Orange County*, 925 F.3d 73, 85 (2d Cir. 2019) (finding "special relationship" between county and civil immigration detainees). We have not, since our decision in *Society for Good Will*, had occasion to reiterate our holding "that anyone in a state institution has a right to safe conditions" regardless of "whether they are voluntary or involuntary residents." 737 F.2d at 1246.

13

Defendants argue that *DeShaney* abrogated *Society for Good Will*'s holding that the voluntary/involuntary distinction is irrelevant. Specifically, pursuant to *DeShaney*, they argue that the substantive due process analysis turns entirely on whether a resident was admitted voluntarily because the state cannot affirmatively deprive voluntarily admitted residents of liberty, as *DeShaney* requires, because they freely submitted to the state's control. We are unpersuaded.

Nothing in *DeShaney* undermines *Society for Good Will*. Unlike *Society for Good Will*, *DeShaney* does not concern the substantive due process rights of people already within the state's custody. Joshua DeShaney was harmed "not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor." *DeShaney*, 489 U.S. at 201. Moreover, the state "played no part" in "render[ing] him any more vulnerable to" his father's abuse. *Id.* at 201. Conversely, plaintiffs in *Society for Good Will* (and C.B. here) were in the state's custody and were rendered more vulnerable by the restraints of their custodial care. *See* 737 F.2d at 1246.

This distinction is critical. That the Due Process Clause confers no affirmative obligation on the state to protect private individuals from private violence, as the Court held in *DeShaney*, 489 U.S. at 197, does not mean that the Constitution does not protect those already within the state's custody and dependent on the state for care.[3] *DeShaney*

---

[3] We previously recognized this distinction in *Brooks v. Giuliani*, 84 F.3d 1454 (2d Cir. 1996). There, we held that the state had no affirmative obligation to continue funding services for disabled adults. *Id.* at 1466. However, we distinguished *Society for Good Will*,

14

itself recognizes as much, noting that "[h]ad the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect." 489 U.S. at 201 n.9.

Nor does *DeShaney*'s dictum concerning the scope of substantive due process rights conflict with *Society for Good Will*. *DeShaney* broadly rejects the notion that the Due Process Clause confers an "affirmative right to governmental aid," and excepts from that general principle circumstances where "the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself." *Id.* at 196, 200; *see also Matican*, 524 F.3d at 155 (noting same). *DeShaney* thus recognizes substantive due process rights where the state affirmatively restrains an "individual's freedom to act on his own behalf" through "incarceration, institutionalization, or other similar restraint of personal liberty." 489 U.S. at 200.

---

noting that the level of care required for those in the state's custody was distinct from the state's obligation to provide such services in the first instance. *See id.* ("*Society for Good Will* dealt with the level of care required by the Due Process Clause, but the state's obligation to provide care and funding in that case was undisputed. When, however, the government disclaims any entitlement to continued funding, and then ends this funding, the reach of *Society for Good Will* is controlled by the Supreme Court's subsequent holding in *DeShaney* . . . ."). We drew the same distinction in *Suffolk Parents of Handicapped Adults v. Wingate*. *See* 101 F.3d 818, 823 (2d Cir. 1996). Both *Brooks* and *Suffolks Parents* acknowledged that substantive due process rights attach when, as here, individuals are subject to custodial restraints. *See Brooks*, 84 F.3d at 1466; *Suffolk Parents*, 101 F.3d at 824.

*Society for Good Will*, although decided four years earlier, followed the same path as *DeShaney*. In *Society for Good Will*, we held as an initial matter that the state had no affirmative obligation to provide services to individuals with developmental disabilities. *See* 737 F.2d at 1246. However, the state's obligations changed once it assumed custody:

> Even granting that the State of New York was not required to build schools for the mentally retarded or admit voluntary residents, once it chose to house those voluntary residents, thus making them dependent on the state, it was required to do so in a manner that would not deprive them of constitutional rights.

*Id.* This analysis fits well within *DeShaney*'s substantive due process framework. The state's affirmative choice to assume custody of the residents, and render them totally dependent on the state for their basic needs, constituted an "affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or *other similar restraint of personal liberty*." *DeShaney*, 489 U.S. at 200 (emphasis added). As *DeShaney* instructs, and as we held in *Society for Good Will*, this "trigger[s] the protections of the Due Process Clause." *Id.*

Admission status is a poor measure of the state's control and the resident's resulting dependence. Contrary to Defendants' position, the state affirmatively acts to restrain the liberty of both involuntarily committed and voluntarily committed residents. The facts of C.B.'s custody make this clear. At Valley Ridge, all residents are treated the same and have the same restrictions on their freedoms. As the state's counsel conceded at oral argument, staff are not even told which residents are admitted voluntarily or

16

pursuant to court order, and the standard of care is the same for all residents. Moreover, regardless of admission status, residents are not free to leave. To do so, a voluntary resident must submit a written request to the director, who, under New York Law, is empowered to "retain the resident" for up to 72 hours if "there are reasonable grounds for belief that the resident may be in need of involuntary care and treatment." N.Y. Mental Hyg. Law § 15.13(b) (McKinney 2011). This process is similar for residents who are involuntarily admitted pursuant to a medical certification. *See id.* § 15.31(a) (providing right to "request for hearing on the question of need for care and treatment at a school" within "sixty days [of] the date of involuntary admission"). We see little sense in placing dispositive weight on a distinction that in fact makes no difference in a resident's care or ability to leave state custody freely.

*Youngberg* itself, which *DeShaney* cites approvingly, underscores the point that how a resident was initially admitted is not the determinative factor that triggers due process protections. There, as here, the resident's mother "asked the Philadelphia County Court of Common Pleas to admit Romeo to a state facility on a permanent basis . . . [because] she was unable to care for [him] or control his violence." 457 U.S. at 309; *see also id.* at 329 (Burger, C.J., concurring) ("The State did not seek custody of respondent; his family understandably sought the State's aid to meet a serious need."). In both cases, the residents were admitted because their mothers sought the state's assistance. It is a legal fiction to say that the state affirmatively acted to restrain the liberty of one but not

17

the other. Instead, and as we recognized in *Society for Good Will*, in determining whether the constitutional protections recognized in *Youngberg* arise, we look to the nature of the custodial relationship at the time an injury occurs, not to how such custody began. *See Soc'y for Good Will*, 737 F.2d at 1246. A focus on the nature of the custody, rather than the form of its inception, better adheres to *DeShaney*'s analysis.[4]

This approach appropriately follows the principles set forth in *Society for Good Will*, *DeShaney*, and *Youngberg*. By limiting *Youngberg*'s substantive due process rights to individuals whose liberty has been restrained such as the residents of Valley Ridge, we

---

[4] Several of our sister circuits have held similarly, and do not place dispositive weight on admission status. *See, e.g.*, *Camp v. Gregory*, 67 F.3d 1286, 1296 (7th Cir. 1995) ("The question is not so much *how* the individual got into state custody, but to what extent the state exercises dominion and control over that individual." (quoting *Walton v. Alexander*, 44 F.3d 1297, 1309 (5th Cir. 1995) (en banc) (Parker, J., concurring specially)); *Torisky v. Schweiker*, 446 F.3d 438, 446 (3rd Cir. 2006) ("[E]ven commitments formally labeled as 'voluntary' may arguably amount to *de facto* deprivations of liberty from their inception."); *Shelton v. Ark. Dep't of Hum. Servs.*, 677 F.3d 837, 840 (8th Cir. 2012) ("A patient's status at the time of admission is not necessarily dispositive, however, because a patient's status may change over time."); *cf. Lanman v. Hinson*, 529 F.3d 673, 682 (6th Cir. 2008) (disagreeing that "because [a mental health patient] voluntarily committed himself . . . and was theoretically free to leave at any time, he was not owed *any* duties under the Fourteenth Amendment"). *But see, e.g.*, *Monahan v. Dorchester Counseling Ctr., Inc*, 961 F.2d 987, 991 (1st Cir. 1992) (finding that the state did not owe a "due process duty to assume a special responsibility" for a resident injured while not in the state's custody "[b]ecause the state did not commit [the resident] involuntarily" and thus "did not take an affirmative act of restraining his liberty" (internal quotation marks omitted)); *Walton*, 44 F.3d at 1299 (noting that a special relationship "does not arise solely because the state exercises custodial control over an individual such as is the case when a person voluntarily resides in a state facility"); *Campbell v. State of Wash. Dep't of Soc. & Health Servs.*, 671 F.3d 837, 843 (9th Cir. 2011) (same).

heed *DeShaney*'s warning not to "thrust upon" the states novel tort liability through our "expansion of the Due Process Clause of the Fourteenth Amendment."[5] *DeShaney*, 489 U.S. at 203. However, *DeShaney* is clear that substantive due process rights arise when the state affirmatively "restrain[s] the individual's freedom to act on his own behalf." *Id.* at 200. Looking beyond technical labels and considering the actual relationship between the resident and the state to determine whether the Due Process Clause applies faithfully adheres to *DeShaney*'s command and our controlling precedent. *See Torisky*, 446 F.3d at 447 (endorsing "looking beyond the label of an individual's confinement to ascertain whether the state has deprived an individual of liberty in such a way as to trigger *Youngberg*'s protections").

This approach also supports the state's compelling interest in promoting voluntary admission to state-run mental health facilities. New York law provides that all state "officers having duties to perform relating to persons with developmental disabilities" are required "to encourage any such person . . . to apply for admission as a

---

[5] *Brown v. City of New York* is a useful counterpoint. *See* 786 F. App'x 289 (2d Cir. 2019) (summary order). There, we considered a homeless shelter resident's substantive due process claim alleging "dangerous conditions and negligent treatment" in a city-run shelter. *Id.* at 291. No due process rights were triggered in *Brown* because, although she was subject to a curfew, she was free to leave during the day, and the city could not "force individuals to stay." *Id.* at 293. Thus, the state's restraints on her liberty were not to such a degree that she was unable to care for herself.

voluntary resident."  N.Y. Mental Hyg. Law § 15.19(a).[6]  This statutory preference reflects a well-settled therapeutic fact—"treatment which is accepted voluntarily is likely to be more effective"—and allows residential treatment facilities to operate relatively free of court involvement.  Gunnar Dybwad & Stanley S. Herr, *Unnecessary Coercion: An End to Involuntary Civil Commitment of Retarded Persons*, 31 Stan. L. Rev. 753, 756 (1979).  We decline to disadvantage individuals with disabilities for heeding the state's encouragement and accepting custodial care, especially when, once admitted, the state treats such residents identically to their involuntarily committed counterparts.  A different approach would undermine these laudable goals.

Accordingly, and in line with *DeShaney*, we hold that when the state exercises sufficient control over a voluntarily committed resident's life and such control renders that individual incapable of helping themselves, due process protections apply.  The degree of control the state exercises over a resident, including limitations on a resident's absolute right to leave, the availability of recourse to self-help, and the custody's overall similarity to court-ordered involuntary commitment are all relevant to this determination.  *See DeShaney*, 489 U.S. at 200 (recognizing due process rights in the context of "incarceration, institutionalization, *or other similar restraint of personal liberty*" (emphasis added)).

---

[6] The statute further provides that "it shall be [the director's] duty to convert . . . any involuntary resident suitable and willing to . . . a voluntary status."  *Id.* § 15.21(a).

20

Looking to the facts of C.B.'s custodial treatment, we have little trouble concluding that his commitment entitled him to substantive due process protections. Valley Ridge profoundly restrained C.B.'s liberty, including by limiting his ability to freely leave custody. If C.B. wanted to leave the locked facility, Valley Ridge required him to submit a formal written request to the director. As provided in the Notice of Status and Rights C.B. signed upon admission, Valley Ridge treated the 72-hour hold as the normal practice. *See* App'x 2238 ("[Y]ou may not leave for three days unless the director lets you."). C.B. was free *to ask* to leave but not actually free to leave. As other circuits recognize, this distinction matters. *See Kennedy v. Schafer*, 71 F.3d 292, 295 (8th Cir. 1995) (holding that if the facility "could lawfully have detained" a voluntarily admitted patient over her request to leave, "the situation that she was in was sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect" (internal quotation marks omitted)); *Torisky*, 446 F.3d at 448 (doubting voluntary status where record was "far from clear that any of the plaintiffs were in a position to extricate themselves from state custody at the time of . . . their injuries").

Beyond his inability to leave, staff exercised near-total control over C.B.'s life. He was under constant supervision. Valley Ridge controlled what he did, where he went, and what he ate. Its staff also tightly circumscribed his access to medical care. They did not allow him to see a doctor or to go to the emergency room without permission. Nor could he contact emergency services. If he dialed 911, Valley Ridge rerouted the call to

21

its safety department, which retained the ultimate decision about whether to call emergency services. As Defendant Williams described, if a resident were to somehow call 911, Valley Ridge presumptively viewed it as "making a false report to 911 and they could get arrested." App'x 479.

The combination of these restraints and C.B.'s corresponding dependence on the state is sufficient to trigger substantive due process protections. By preventing him from freely leaving, and by proactively monopolizing the power to call an ambulance, emergency care (or law enforcement, for that matter), Valley Ridge completely disabled C.B. from caring for himself. In emergent circumstances, C.B.'s life was entirely in the state's hands. As then- Chief Judge Easterbrook noted in a related context, "[i]f the state forbids private rescue of a drowning man, then the state must furnish a competent rescue service of its own." *Witkowski v. Milwaukee County*, 480 F.3d 511, 513 (7th Cir. 2007). Here, by maintaining complete control over C.B.'s life, and rendering him completely dependent on the state, Valley Ridge was required to operate within the limits set by *Youngberg*, *Society for Good Will*, and *DeShaney*.

Defendants' arguments to the contrary are unpersuasive. They argue that C.B.'s personal liberty was not restricted because C.B. was "free to leave" rendering his care voluntary. Appellees' Br. 31. They insist that "nothing prevented him . . . from seeking outside care in a more orderly fashion, with advance notice to Valley Ridge." Appellees' Br. 33. We disagree. C.B.'s status was not rendered voluntary simply because he could

22

ask to leave—that he could not leave without initiating a lengthy process that could ultimately lead to a court-ordered commitment establishes the opposite. Indeed, even residents initially admitted involuntarily by medical certification must follow a similar process to leave. *See* N.Y. Mental Hyg. Law § 15.31. Moreover, even if he did ask, it is hard to imagine that Valley Ridge would have immediately or expeditiously set free, to independently care for his basic needs, a developmentally disabled man who had spent his entire adult life institutionalized. To the contrary, Defendant Williams acknowledged Valley Ridge's practice of taking "72 hours" to "have discussion[s] with [residents] about safe ways to depart our facility and getting everything set up where they can do it in a safe manner." App'x 479.

Even assuming he could care for his general needs while at Valley Ridge, C.B.'s medical condition, in the days leading up to his death, would have precluded such a release. Contrary to Defendants' contention, his medical emergency actually did prevent him from "seeking outside care in a more orderly fashion." Appellees' Br. 33. By the time C.B. told Novack that he could not breathe and asked to go to the hospital, he had only one day to live—two fewer than the (possibly requisite) remaining waiting period. Under these circumstances, Valley Ridge's affirmative restraints on C.B.'s freedom to care for himself entitled C.B. to substantive to due process protections.

## II. QUALIFIED IMMUNITY

Defendants argue that even if they violated C.B.'s constitutional rights, they are entitled to qualified immunity because it was not clearly established when C.B. died whether and under what circumstances a voluntarily committed resident has substantive due process rights. Although Defendants raised this argument below, the district court did not reach it because it found that C.B.'s admission status foreclosed his constitutional claim.

We find that under *Youngberg, DeShaney*, and *Society for Good Will*, C.B.'s substantive due process right to adequate medical care was clearly established. "A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what they are doing violates that right." *Eaton v. Estabrook*, 144 F.4th 80, 93 (2d Cir. 2025) (alterations adopted) (quoting *Linton v. Zorn*, 135 F.4th 19, 32 (2d Cir. 2025)). "Even when we find a right clearly established, defendants 'may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition.'" *Wiggins v. Griffin*, 86 F.4th 987, 994 (2d Cir. 2023) (quoting *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998)).

Decades of authority from the Supreme Court and this Court have established the right to adequate medical care for developmentally disabled residents in state custody who are dependent on the state for care. *See Youngberg*, 457 U.S. at 324 (recognizing

24

committed resident's right to "adequate food, shelter, clothing, and medical care"); *Soc'y for Good Will*, 737 F.2d at 1246 ("[A]nyone in a state institution has a right to safe conditions."); *P.C. v. McLaughlin*, 913 F.2d 1033, 1042 (2d Cir. 1990) ("[Individuals with developmental disabilities] in the custody of state officials have constitutionally protected rights to adequate food, shelter, clothing and medical care . . . ." (citation omitted)); *G.B. v. DiPace*, No. 14-cv-0500, 2019 WL 1385840, at *6 (N.D.N.Y. Mar. 27, 2019) ("The Second Circuit has further clearly established that a developmentally disabled individual in the custody of state officials ha[s] constitutionally protected rights to adequate food, shelter, clothing and medical car[e], to safe living conditions and to freedom from undue bodily restraint." (internal quotation marks omitted)).

Moreover, a reasonable person in Defendants' position would have known that their conduct was unlawful. As counsel for the State of New York conceded, Valley Ridge staff were unaware of any resident's admission status and treated all residents pursuant to the same standard of care. Defendants could not, in other words, reasonably believe that their conduct was lawful due to C.B.'s admission status because this information was unknown (and unknowable) to them as a matter of course.

Although we find that C.B.'s right to adequate medical care was clearly established, we are "mindful that we are a court of review, not of first view," *Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005), and thus leave to the district court (or a jury) to consider in the first instance whether each individual Defendant violated C.B.'s clearly

25

established rights. *See Eaton*, 144 F.4th at 90, 98 (delineating contours of clearly established right and remanding to resolve "factual disputes bearing on whether [defendant's conduct] was unconstitutionally excessive under the Fourteenth Amendment . . . precluding summary judgment . . . on qualified immunity grounds"); *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 11 F.4th 138, 143 (2d Cir. 2021) ("It is our general policy that the trial court should consider arguments—and weigh relevant evidence—in the first instance." (internal quotation marks omitted)).

## III. MOTION TO AMEND

Finally, we turn to whether the district court erred in denying J.M. leave to amend to add claims against a new defendant, Anita Baral. We review the denial for abuse of discretion. *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003).

Where, as here, a party moves to amend after the deadline imposed by the court's scheduling order, the moving party must show "good cause" for the amendment. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 243 (2d Cir. 2007); *see also* Fed. R. Civ. P. 16(b). The "primary consideration" in determining good cause "is whether the moving party can demonstrate diligence." *Kassner*, 496 F.3d at 244. "[A] party fails to show good cause when the proposed amendment rests on information that the party knew, or should have known, in advance of the deadline." *Dervan v. Gordian Grp. LLC*, No. 16-cv-1694, 2018 WL 4278287, at *1 (S.D.N.Y. June 20, 2018) (Nathan, J.) (internal quotation marks omitted).

26

Plaintiff argues that she learned new facts about Baral's potential liability during the depositions of Defendant Cassata and Baral on February 8, 2022. In sum and substance, Plaintiff alleges that during Cassata's deposition, she discovered that Cassata notified Baral of C.B.'s symptoms—including his difficulty breathing and chest pains—but Baral failed to provide medical care. J.M. argues she moved diligently to amend her complaint to add claims against Baral once she discovered these new facts.

The record reveals that Plaintiff knew, or had reason to know, of Baral's involvement well over a year before the February 2022 depositions. In September 2020, Defendants identified Baral as someone who "may have discoverable information relating to the events of April 8-9, 2018" on their initial disclosures. App'x 159. Then, in January 2021, Defendants disclosed OPWDD's internal investigation notes, which included interview notes for Cassata and Baral. fThe notes reflect that on April 4, 2018, Cassata noticed that C.B. was tired, ill, and had difficulty breathing, that she notified Baral, and that Baral visited C.B. and failed to provide medical care. App'x at 1142 ("[Baral] patted [C.B.] on his back and told him to drink plenty of fluids and get some rest.").

These notes were more than sufficient to put Plaintiff on notice of her potential claim against Baral. The district court thus acted well within its discretion in finding that Plaintiff failed to exercise the diligence necessary to establish "good cause."

27

## CONCLUSION

The order and judgment of the district court are **VACATED** and the case **REMANDED** for further proceedings in conformity with this opinion.